(Nos. 84761, 84762 cons

CARL LaFEVER, Appellee and Cross-Appellant, v. KEMLITE COMPANY, a Division of Dyrotech Industries, Inc., Appellant (Kemlite Company, Appellee, v. Banner Western Disposal, a Division of Waste Management of North America, Inc., Appellant).

*Opinion filed December 31, 1998.*

BILANDIC, J., took no part.

HEIPLE, J., dissenting.

Michael B. Kilgallon, of Kilgallon & Carlson, of Chicago, for appellant Kemlite Co.

David F. Buysse, of Garofalo, Schreiber & Hart, Chrtd., of Chicago, for appellant Banner Western Disposal.

Marc A. Taxman, of Anesi, Ozmon, Rodin, Novak & Kohen, Ltd., of Chicago, for appellee LaFever.

Bruce R. Pfaff, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE McMORROW delivered the opinion of the court:

Plaintiff Carl LaFever sued defendant/third-party plaintiff Kemlite Company (Kemlite) for injuries sustained while working on premises owned by Kemlite. Kemlite filed a third-party action for contribution (740 ILCS 100/0.01 *et seq.* (West 1996)) against plaintiff's employer, third-party defendant Banner Western Disposal (Banner). A jury awarded plaintiff damages and found Banner liable for contribution. The appellate court partially affirmed and partially reversed the circuit court of Cook County's judgment. 293 Ill. App. 3d 260. We granted petitions for leave to appeal filed by Kemlite and by Banner (166 Ill. 2d R. 315), and plaintiff cross-appealed (155 Ill. 2d R. 318). The issues raised for our review are whether (1) the circuit court erred by ruling as a matter of law that Kemlite owed a duty of care to plaintiff, (2) the circuit court erred by granting Banner's motion to waive its lien on plaintiff's workers' compensation (820 ILCS 305/1 *et seq.* (West 1996)) after the return of the jury's verdict, and (3) the circuit court abused its

discretion by instructing the jury on plaintiff's claim for future lost income. We affirm in part and reverse in part.

## BACKGROUND

Kemlite operates a manufacturing facility in Joliet, Illinois. Kemlite produces a fiberglass reinforced polyester resin panel for transportation and building products industries. The product, which is made of chopped fiberglass, resin and fillers, starts as a liquid, is poured on a manufacturing line, and cures on the line into a hardened product.

As the panels are cut to fit customer specifications, the manufacturing process produces "edge trim," a waste product. The edge trim is very slippery and difficult to grasp by hand. Edge trim is cut into one- to two-foot lengths, deposited in containers or buggies and taken to a compactor at the southern edge of the facility. The compactor unit is four to five feet wide and four feet deep. Kemlite employees activate a ram attached to the compactor, which presses the waste into a compactor box or container. The ram retracts until more waste is dumped into the compactor, and the process is repeated.

At the time of the accident, Kemlite contracted with Banner to dispose of the waste collected in the compactor container. Kemlite is a 24-hour-per-day facility, requiring daily pick up of the container, and sometimes multiple pick ups in one day. Banner employed "roll-off" drivers, including plaintiff, to pick up the debris at the Kemlite facility and dispose of the debris at a dump site. Roll-off drivers testifying at the trial of this matter described their duties at the Kemlite facility as follows. A roll-off driver backs his truck up to the compactor container, gets out of his truck and walks into the compactor box containing the debris. Going to the back of the box, the driver secures a wooden skid at the end of the container in order to prevent refuse from spilling out of the box. The driver then removes a "pinning" bar from the side

of the container and attaches the container with a cable to the back of the truck. The driver loosens and detaches two turn buckles, each weighing 20 to 25 pounds, that secure the container to the compactor. The driver returns to the cab of his truck and drives the truck forward, pulling the container away from the compactor. The driver then gets out of the truck again, in order to shovel and clean up any debris that has fallen out of the truck as he moved the container away from the compactor. After dumping the contents of the container into a landfill, the driver returns the container to Kemlite.

While plaintiff and the other drivers testified before the circuit court that they, as roll-off drivers, bore the responsibility of cleaning up any debris they created or spilled in the course of removing and emptying the waste containers at Kemlite, they maintained that considerable debris was often already on the ground near the container when they arrived at Kemlite. The drivers understood that cleaning up this debris was not Banner's responsibility, and that Kemlite had its own maintenance staff to tend to the Kemlite premises. The drivers averred that Kemlite employees would fill the compactor container to overflowing. Banner drivers, including plaintiff, described occasions when they saw open carts sitting near the compactor container, which was too full to receive any more edge trim. The carts, used by Kemlite employees to haul trim to the compactor container, were themselves open, and the edge trim slid out of the sides and back of the carts onto the ground near the compactor container.

All of the drivers complained to Banner personnel about the danger posed by the edge trim at Kemlite. Sometimes, they directed their complaints to the Banner dispatcher on duty, whom they asked to call Kemlite and request help from a Kemlite employee in cleaning up the container. Sometimes they complained to their superior at Banner, Terry Wilder. According to Wilder, he informed

Kemlite personnel of the drivers' concerns that they might injure themselves on the debris. Banner drivers Jerome Blackwell and Larry Graves testified that they informed Kemlite employees of the "mess" at the compactor location. Lynn Smith, a dispatcher for Banner, received calls from Banner drivers before June 22, 1990, concerning "material all over the ground [at Kemlite] that was dangerous for the drivers to walk on." Smith would call Kemlite and ask Kemlite employees to clean the area around the compactor. Generally, Kemlite would respond that "they'd take care of it." Terry Wilder also forwarded complaints to Kemlite regarding the area around the compactor container.

Edgar Johnson, production superintendent for Kemlite, also testified below. He affirmed that Kemlite employees were responsible for ensuring the orderliness of the facility, including the area around the compactor container, and that Kemlite had in the past received requests for help from Banner in cleaning "major spills" around the compactor area.

While picking up a compactor container at Kemlite on June 22, 1990, plaintiff slipped on some edge trim and fell, causing injury to plaintiff's back.

On October 10, 1991, plaintiff filed a single count complaint against Kemlite. As amended, the complaint alleged that Kemlite "carelessly and negligently caused and permitted [the Kemlite] premises to become and remain in a dangerous condition for persons using said premises, although [Kemlite] knew, or in the exercise of ordinary and reasonable care should have known, of said dangerous condition." Specific instances of alleged negligent acts or omissions committed by Kemlite included accumulation of fiberglass waste and dust on a walkway located "at or near" the compactor container, failure to maintain and inspect the walkway, and failure to warn plaintiff of the dangerous condition of the walkway.

By order entered June 17, 1992, the circuit court granted Kemlite leave to initiate a third-party action against Banner. In pertinent part, Kemlite asserted that Banner negligently failed to: provide plaintiff with a safe place to work, warn plaintiff of conditions inherent in the work performed, provide plaintiff with adequate equipment to complete his work, and properly train plaintiff. Kemlite sought recovery pursuant to the Joint Tortfeasors Contribution Act (Contribution Act) (740 ILCS 100/0.01 *et seq.* (West 1996)) for Banner's alleged liability for plaintiff's injuries.

A jury returned a verdict for plaintiff in his personal injury action, awarding him $1,122,261.21 in damages. The jury also found for Kemlite in its third-party action against Banner. Among the litigants, the jury apportioned liability as follows: plaintiff, 5%; Kemlite, 75%; and Banner, 20%. Accounting for the jury's finding of plaintiff's comparative negligence, the circuit court entered a judgment order awarding plaintiff $1,066,148.15.

Banner filed a timely post-judgment motion seeking, among other things, leave to waive its lien of $222,267.02 on plaintiff's recovery, an amount equivalent to workers' compensation paid by Banner to plaintiff, pursuant to the Workers' Compensation Act. 820 ILCS 305/5(b) (West 1996). Banner maintained that, by waiving the lien, Banner could relieve itself of any liability to Kemlite for contribution. Further, and pursuant to *Lannom v. Kosco*, 158 Ill. 2d 535 (1994), the $222,267.02 workers' compensation lien acted as full satisfaction of Kemlite's $224,452.24 liability for contribution.

The circuit court granted Banner's motion over plaintiff's objection, dismissed Kemlite's third-party claim against Banner, and reduced the judgment against Kemlite by $222,267.02, to $843,881.13.

On appeal, the appellate court affirmed the jury's verdict in favor of plaintiff, but reversed the circuit

court's order granting Banner's post-trial motion. 293 Ill. App. 3d 260. In relevant part, the appellate court ruled that the statutory lien on an injured worker's compensation payments could not be waived after the entry of a verdict in the worker's personal injury action. The appellate court held as well that Kemlite owed plaintiff a duty of care despite the open and obvious hazard posed to plaintiff by the edge trim on Kemlite's premises, and that the circuit court erred when it instructed the jury on the elements of plaintiff's claim for future wages. Consequently, the appellate court remanded the action for recalculation of the judgment.

## ANALYSIS

### A. Whether the Circuit Erred by Ruling That Kemlite Owed a Duty of Care to Plaintiff

Kemlite urges that the circuit court erred by refusing to direct a verdict for Kemlite on the question of whether Kemlite owed a duty of care to plaintiff. Specifically, Kemlite contends that plaintiff encountered an "open and obvious" hazard on Kemlite's property in the form of the fiberglass edge trim, and that Kemlite owed no duty of care to protect plaintiff from injuries arising from open and obvious dangers. Kemlite argues further that, in affirming the judgment of the circuit court, the appellate court misapplied four factors controlling the imposition of a tort duty in Illinois.

"Unless a duty is owed, there is no negligence." *American National Bank & Trust Co. v. National Advertising Co.*, 149 Ill. 2d 14, 26 (1992). Whether a duty exists is a question of law. *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990). Whether a duty exists is also an inquiry shaped by public policy (*Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987); *Ward*, 136 Ill. 2d at 140) since we must decide whether defendant and plaintiff stand in such a relationship to

one another that the law imposes on defendant an obligation of reasonable conduct for the benefit of plaintiff (*Ward*, 136 Ill. 2d at 140). Accordingly, we consider not only the reasonable (1) foreseeability and (2) likelihood of injury, but also (3) the magnitude of the burden on defendant in guarding against injury and (4) the consequences of placing that burden on defendant. *Ward*, 136 Ill. 2d at 140-41.

In the case at bar, the appellate court resolved the duty question solely by applying the four factors enumerated above. 293 Ill. App. 3d at 270-71. While we agree with the appellate court that Kemlite owed plaintiff a duty of care, we conclude that the appellate court reached that holding by a flawed analytical route. The court improperly discounted the relevance of section 343A of the Restatement (Second) of Torts (1965) to the outcome of this case.

When, as here, plaintiff alleges he was injured by a condition on defendant's property while on the property as an invitee,[1] we decide the foreseeability prong of the duty test by reference to section 343 of the Restatement (Second) of Torts. *Genaust v. Illinois Power Co.*, 62 Ill. 2d 456, 468 (1976); *Ward v. K mart Corp.*, 136 Ill. 2d 132, 151 (1990); *Deibert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430, 438 (1990). Section 343 states in relevant part:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
> (a) knows or by the exercise of reasonable care would

---

[1]The common law distinction between invitees and licensees is no longer dispositive of the liability of landowners. Pursuant to the Illinois Premises Liability Act (740 ILCS 130/1 *et seq.* (West 1996)), an owner or occupier of premises owes invitees and licensees the same "duty of reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them."

discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger." Restatement (Second) of Torts § 343 (1965).

Despite the duty set forth in section 343, Kemlite insists that the edge trim hazard encountered by plaintiff was "open and obvious" and therefore negated any duty Kemlite owed to plaintiff. In *Ward*, this court adopted section 343A of the Restatement, which states an "open and obvious hazard" exception to the duty of care set forth in section 343. *American National Bank & Trust Co.*, 149 Ill. 2d at 26; *Ward*, 136 Ill. 2d at 150-51; Restatement (Second) of Torts § 343, Comment *a*, at 216 (1965). Kemlite is correct that section 343A relieves possessors and owners of land from liability for open and obvious dangers. However, the exception stated in 343A is not limitless; section 343A states in relevant part:

"A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*" (Emphasis added.) Restatement (Second) of Torts § 343A(1) (1965).

See also *Ward*, 136 Ill. 2d at 145 ("[T]o the extent that the rule may have held that the duty of reasonable care owed by an owner or occupier to those lawfully on his premises does not *under any circumstances* extend to conditions which are known or obvious to such entrants, that rule is not the law in this State" (emphasis in original)).

No party to the present appeal disputes the danger presented by the edge trim at the Kemlite facility, or that it was obvious and known to Kemlite and Banner employees alike. Plaintiff and other drivers employed by Banner described the edge trim as "slippery" and that

walking on the edge trim was like "walking on ice." A compressor located near the compactor produced condensation, and water was frequently present in the area near the compactor container. As a result, the edge trim regularly became wet, thereby increasing its slipperiness. Three other roll-off drivers, in addition to plaintiff, testified that they had slipped on the edge trim debris near the container prior to June 22, 1990, and one testified that he had fallen. Kemlite employee Edgar Johnson stated that he, too, was familiar with the slipperiness of the edge trim. Moreover, Johnson confirmed that the edge trim was sometimes on the ground around the compactor container and that condensation collected at that site.

Whether the possessor of the premises should guard against harm to the invitee, despite the obviousness of the hazard, depends on two considerations. According to committee comments appended to section 343A (Restatement (Second) of Torts § 343A, Comment *f*, at 220 (1965)), the possessor of the premises should anticipate harm to an invitee when the possessor "has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it." *Ward*, 136 Ill. 2d at 149-50. Similarly, harm may be reasonably anticipated when the possessor "has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." Restatement (Second) of Torts § 343A, Comment *f*, at 220 (1965). Some courts refer to the second exception as the "deliberate encounter exception." *Jackson v. Hilton Hotels Corp.*, 277 Ill. App. 3d 457, 464 (1995).

In the present appeal, the appellate court correctly found no proof of a foreseeable distraction that would

place a duty of care on Kemlite. In fact, plaintiff testified that, although he was carrying a metal bar at the time of his fall, he was not distracted and could see where he was going. However, the appellate court errantly concluded that the "deliberate encounter" exception to the open and obvious doctrine is inapplicable to this case. Retrieving edge trim from the Kemlite facility was plaintiff's job. In order to unhook and load the container onto his truck, plaintiff had to walk through any edge trim that was on the ground, as it frequently was. Despite Johnson's testimony that Kemlite never received any complaints from Banner employees about the area around the compactor, he admitted that drivers had to traverse the Kemlite premises in order to do their jobs and that calls had been made to Kemlite by Banner when drivers were seeking "assistance *** cleaning up" a "major spill." Kemlite knew that the edge trim posed a hazard, and knew, at least implicitly, that edge trim collected in the area around the compactor, since Johnson testified that Kemlite utility workers would clean it up whenever Kemlite was aware of it. We find that Kemlite could have reasonably foreseen that plaintiff would risk walking through the edge trim, because it was necessary for plaintiff to fulfill his employment obligations.

Kemlite urges the court to adjudge foreseeability from the perspective of what the landowner may "reasonably expect of the entrant in terms of knowledge of the danger, rather than *** focusing on what the entrant expected or desired the landowner to do to protect him." Kemlite is correct. The Restatement directs that with regard to open and obvious hazards, liability stems from the knowledge of the possessor of the premises, and what the possessor "ha[d] reason to expect" the invitee would do in the face of the hazard. Restatement (Second) of Torts § 343A, Comment *f*, at 220 (1965); R. Ferrell, *Emerging Trends in Premises Liability Law*, 21 Ohio N.U.L. Rev. 1121, 1137 (1995).

Nonetheless, Kemlite abandons the Restatement's directives when Kemlite next contends that a "deliberate encounter" like plaintiff's cannot give rise to liability unless "there is no reasonable alternative available to the worker other than encountering the dangerous condition and the worker's continued employment is at stake if he doesn't encounter the condition," citing *Jackson v. Hilton Hotels Corp.*, 277 Ill. App. 3d 457, 465 (1995), and *Burse v. CR Industries, Inc.*, 288 Ill. App. 3d 48 (1997). The test proposed by Kemlite would require a court to decide foreseeability by measuring the reasonableness of the *entrant's* actions, and not those of the landowner, even though the Restatement plainly requires otherwise.

Further, to the extent Kemlite suggests that a plaintiff cannot raise the deliberate encounter exception without furnishing proof of an actual threat of termination, we believe that Kemlite confuses evidence relevant to a determination of duty with evidence material to an entirely distinct concept, *i.e.*, whether plaintiff assumed the risk of the danger encountered. An illustration furnished by the Restatement is instructive on the difference:

> "A owns an office building, in which he rents an office for business purposes to B. The only approach to the office is over a slippery waxed stairway, whose condition is visible and quite obvious. C, employed by B in the office, uses the stairway on her way to work, slips on it and is injured. Her only alternative to taking the risk was to forgo her employment. A is subject to liability to C." Restatement (Second) of Torts § 343A, Illustration 5, at 221 (1965).

Implicit in the example is the assumption that, if the employee fails to go to work because of the condition on the stairway, she will suffer negative consequences in terms of her employment. Those consequences could include termination, but might also entail discipline that falls short of termination. In any event, the employee will conclude that the risks of encountering the hazard are

outweighed by the external motivating factor of her employment. Knowing that individuals will make this deliberate choice when fueled by concerns such as employment, the drafters of the Restatement have concluded that the encounter with the hazard is reasonably foreseeable.

Whether an employee will in fact lose his job if he refuses to proceed in face of the danger cannot be known, absent an individual interview by the premises owner with every business invitee that comes on to the premises. The court finds nothing in the Restatement imposing such a requirement on the owners and occupiers of land. Moreover, while the actual consequences to the employee for refusing to "encounter" a danger may be of material concern, those consequences are relevant only to the question of whether the employee unnecessarily assumed the risk of the encounter.

In *Keller v. Holiday Inns, Inc.*, 107 Idaho 593, 691 P.2d 1208 (1984), two employees of a hotel sued their employer, Holiday Inns, Inc., for injuries incurred when security gates owned by the hotel fell on the employees. The employees worked in the hotel gift shop, and, in order to open the shop each day, the employees had to unlock, fold and move the gates.

Although the Idaho Supreme Court declined to adopt sections 343 and 343A in support of its holding, the court cited with approval a prior Idaho Supreme Court decision that affirmed use of section 343A as a jury instruction. Critically, too, the court concluded that, in light of the "economic compulsion" on an employee to perform his or her job, the landowner/employer had reason to expect that an employee would encounter the obvious danger rather than face the prospect of losing the job.[2] See also *Koniced v. Loomis Brothers, Inc.*, 457 N.W.2d

---

[2]Contrary to the interpretation drawn by the dissent, the *Keller* decision is silent as to whether Holiday Inn would have

614, 618 (Iowa 1990) (evidence raised jury question of whether contractor owed a duty to a construction worker who fell through a skylight because contractor could anticipate that workers would proceed in face of obvious danger so as to avoid the risk of losing their jobs); *Cihon v. Cargill, Inc.*, 293 Ill. App. 3d 1055, 1064 (1997); *Kosinski v. Inland Steel Co.*, 192 Ill. App. 3d 1017, 1024 (1989).

At bar, Kemlite, through Edgar Johnson, admitted that it knew that the Banner drivers inevitably encountered the edge trim spilled by Kemlite employees in order to haul away the compactor container. Kemlite also could reasonably foresee an "economic compulsion" (*Keller*, 107 Idaho at 596, 691 P.2d at 1210-11) imposed on the roll-off drivers to perform the work they were hired to do. Kemlite therefore had reason to know that these same drivers would deliberately encounter the hazard in order to fulfill their obligations and, consequently, keep their jobs.

We find *Jackson*, 277 Ill. App. 3d 457, and *Burse*, 288 Ill. App. 3d 48, on which plaintiff relies, unpersuasive. *Burse* is distinguishable from the present case because the appellate court there found that the premises in question held no "open and obvious" hazard which could be "deliberately encountered." *Burse*, 288 Ill. App. 3d 48. For this reason, the defendant by definition could not anticipate such an encounter. *Jackson* is flawed because its analysis of the "deliberate encounter" exception turns almost exclusively on the knowledge of the injured party (*Jackson*, 277 Ill. App. 3d at 464-65 ("The plaintiffs did not plead in the second amended complaint, or aver in

actually fired the *Keller* plaintiffs for refusing to move the security gates, or whether the plaintiffs ever requested aid from the defendant in moving the gates. Regardless, it was reasonably foreseeable that the plaintiffs would attempt to move the gates in order to do their jobs and that, because Holiday Inn knew the gates were "prone to fall" (*Keller*, 107 Idaho at 594, 691 P.2d at 1209), the plaintiffs might be injured in the process.

the affidavit, the absence of any reasonable alternative to lifting the fully loaded gang box by hand, such as lightening it by removing some of its contents, making sufficient inquiry into the possibility of using the chained and locked portable dockplate, or seeking assistance from the defendant's employees. Moreover, *** [plaintiffs do not allege that] James Jackson took the necessary precaution of investigating the weight of the gang box before attempting to lift it. *** Nor are there any factual allegations *** sufficient to establish that James Jackson's continued employment was at stake if he refused to heft the gang box")), a perspective incompatible with the Restatement view.

We emphasize that, by our formal adoption of the deliberate encounter exception to the open and obvious doctrine,[3] we do not render property owners insurers of invitees' welfare. See *Ward*, 136 Ill. 2d at 156. Our finding that a landowner may reasonably be expected in certain instances to predict that an invitee may suffer harm from an open and obvious danger is conclusive only of the possessor's duty, and then only partially so, since foreseeability alone is not determinative of duty. *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 457 (1996). The existence of a duty is not the equivalent of a breach of duty. Any plaintiff claiming that a premises owner owed plaintiff a duty of care cannot prevail unless plaintiff also proves that the owner's efforts to protect invitees from harm were inadequate. *Deibert*, 141 Ill. 2d at 441. Nor is this opinion intended to dilute or minimize the relevance of comparative negligence or any other concept that may be applied when proof exists that the possessor of the property is not wholly responsible for the invitee's injury. The openness or obviousness of a

---

[3]Although recognized by our appellate court for years, this court has never before applied the exception in a decision. *Jackson*, 277 Ill. App. 3d at 464.

hazard will have a bearing on the plaintiff's ultimate recovery (*Ward*, 136 Ill. 2d at 143; Restatement (Second) of Torts § 343A, Comment *f*, at 220 (1965)), but will never be wholly determinative of the landowner's liability. As this court has stated on several prior occasions, duty and liability are distinct concepts that must be separately considered. See *Bucheleres*, 171 Ill. 2d at 447 ("where there is no duty there is no liability, and therefore no fault to be compared"); *Ward*, 136 Ill. 2d at 148; *Deibert*, 141 Ill. 2d at 442-43.

Having decided that Kemlite could reasonably have anticipated plaintiff's deliberate encounter with the edge trim at the Kemlite site, we now decide whether the remaining elements of Illinois' duty test have been satisfied. The likelihood of plaintiff's injury is our next consideration, and we find that that factor does not weigh heavily in favor of finding a duty. The slipperiness of the edge trim was well known to plaintiff, as was the fact he needed to proceed cautiously when walking on it. In such instances, the law presumes that the plaintiff will "appreciate and avoid" the risk, thereby reducing the potential for harm. *Bucheleres*, 171 Ill. 2d at 448. We concur with the appellate court, however, that this prong of the duty test must be discounted: even though he was clearly aware of the edge trim, plaintiff "could not avoid it." 293 Ill. App. 3d at 270.

The appellate court also correctly found that the magnitude of the burden on Kemlite of guarding against edge-trim-related injuries was slight. The Kemlite plant operated 24 hours a day and had its own maintenance staff, which evidence indicated sometimes fell short of all of its maintenance obligations. We conclude that only a slight increase in personnel, or perhaps a shifting of a few responsibilities for "utility" workers would have been sufficient to keep the container area free of potentially hazardous matter. Evidence presented at trial

showed as well that Kemlite scheduled at least one pick up a day from Banner, and sometimes more, if necessary. The record also demonstrated that the compactor container was frequently filled to overflowing. Since Kemlite knew additional trips could be made by Banner to the Kemlite facility, an increase in the number of requested pick ups by Kemlite during the course of a day might also have increased the safety of conditions at Kemlite.

Finally, we believe that the consequences of placing that burden on Kemlite would be unremarkable. We explained in the preceding paragraph that Kemlite was not only aware of the hazard posed by the edge trim, but had already initiated maintenance measures, albeit inadequate ones, to address the problem. Satisfying their duty of care as landowners, therefore, would likely require only a refinement or intensification of existing procedures, as opposed to the creation of safety measures that otherwise would not have existed.

For these reasons, we affirm the appellate court's holding that Kemlite owed plaintiff a duty of care at the Kemlite premises. Neither the appellate court nor the circuit court erred in resisting Kemlite's request for a directed verdict on this element of plaintiff's negligence claim.

### B. Whether the Circuit Court Erred in Granting Banner's Motion to Waive its Workers' Compensation Lien After the Return of the Jury's Verdict

The Illinois Workers' Compensation Act (820 ILCS 305/1 (West 1996)) enables an injured worker to institute legal proceedings against tortfeasors responsible for causing the worker injury, and for which the worker receives workers' compensation. If the worker prevails in his personal injury lawsuit, the settlement or judgment received by the worker is dedicated to repaying workers' compensation paid by his employer. 820 ILCS 305/5(b)

(West 1996). The employer may claim a lien on the worker's recovery, in an amount equal to the amount of workers' compensation due the worker. 820 ILCS 305/ 5(b) (West 1996). Section 5(b) of the Workers' Compensation Act provides further that, should the worker's third-party action prevail, then, from the compensation reimbursed to the employer, the employer must pay its *pro rata* share of the worker's costs of bringing the litigation and, unless otherwise agreed, 25% of plaintiff's counsel's legal fees. 820 ILCS 305/5(b) (West 1996); *Ramsey v. Morrison*, 175 Ill. 2d 218, 237 (1997). The legislature enacted the costs and fee provisions of section 5(b) to ensure that "an employer *** contribute[s] to the necessary costs of the employee's recovery against a negligent third party where the employer is to receive reimbursement from the recovery for [workers'] compensation payments made or to be made to the employee." *Reno v. Maryland Casualty Co.*, 27 Ill. 2d 245, 247 (1962).

Additionally, an employer can choose not to seek reimbursement of its workers' compensation obligation. An employer can waive the lien it holds on the worker's recovery in his personal injury action. Under the authority of *Lannom v. Kosco*, 158 Ill. 2d 535 (1994), moreover, by waiving its section 5(b) lien, the employer may avoid liability for contribution to the other tortfeasors allegedly responsible for the worker's injury.

The controversy at bar arises from Banner's decision to waive its workers' compensation lien after the jury returned its verdict in plaintiff's personal injury lawsuit. The trial court granted Banner's motion to waive its lien, but the appellate court reversed. The appellate court held that an employer may not waive its workers' compensation lien "posttrial" and thereby "avoid its fees and costs obligation" to its employee. 293 Ill. App. 3d at 275. The appellate court ruled that "an employer's workers' compensation lien constitutes a right to reimburse-

ment" and that "[a]fter plaintiff recovers from a third party, the employer's right to reimbursement is statutorily reduced under section 5(b) by the employee's entitlement to a proportionate share of fees and costs." 293 Ill. App. 3d at 275. Accordingly, "the employer should not be allowed to circumvent payment of its section 5(b) fees and costs, after the cause has proceeded through trial." 293 Ill. App. 3d at 275.

Section 5(b) plainly predicates the employer's obligation to pay costs and fees on actual *reimbursement* of workers' compensation payments from the "fund" created by the employee. See *Ramsey*, 175 Ill. 2d at 237-38; 820 ILCS 305/5(b) (West 1996). Section 5(b) states in pertinent part:

> "*Out of any reimbursement received by the employer* pursuant to this Section the employer shall pay his pro rata share of all costs and reasonably necessary expenses in connection with such third-party claim, action or suit and where the services of an attorney at law of the employee or dependents have resulted in or substantially contributed to the procurement by suit, settlement or otherwise of the proceeds out of which the employer is reimbursed, then, in the absence of other agreement, the employer shall pay such attorney 25% of the gross amount of such *reimbursement*." (Emphasis added.) 820 ILCS 305/5(b) (West 1996).

In this case, Banner waived its right to the lien without ever seeking reimbursement of its workers' compensation payments. The express, statutory condition precedent (*Corley v. James McHugh Construction Co.*, 266 Ill. App. 3d 618, 622 (1994)) to payment of costs and fees under section 5(b) was never fulfilled. *Ipso facto*, Banner's obligation to pay costs and fees was never triggered. *Corley*, 266 Ill. App. 3d at 621 ("in the *absence of a waiver* of the workers' compensation lien, the employer must pay his *pro rata* share of costs and expenses and, unless otherwise agreed, must pay as fees to the employee's attorney 25% of the gross amount of such reimbursement" (emphasis in original)).

In fact, *Corley v. James McHugh Construction Co.*, 266 Ill. App. 3d 618, 621 (1994), a case on which the appellate court relies, expressly rejected a suggestion that the plaintiff should receive section 5(b) costs and fees even when the employer waived the workers' compensation lien. The *Corley* court would not shift responsibility for the section 5(b) costs and fees to the defendants in the underlying personal injury suit. According to the appellate court, the terms employed in section 5(b) left no question as to who should pay the expenses and out of what funds:

"Section 5(b)'s plain language thus provides that the employer must pay the amounts out of any reimbursement that it receives. Where, as here, the employer waives its right to that reimbursement, the condition precedent of having received the reimbursement as anticipated by section 5(b) never occurred. As a result, the employer is not under any duty or obligation to contribute to the employee's cost of obtaining the recovery.

\* \* \*

The policy behind section 5(b) is to compensate plaintiff for obtaining a judgment from which an employer is reimbursed. [Citation.] Here, the employer waived that reimbursement to the benefit of [plaintiff] so he is not entitled to those fees, costs, and expenses." *Corley*, 266 Ill. App. 3d at 622-24.

In *Silva v. Electrical Systems, Inc.*, 183 Ill. 2d 356 (1998), we recently reaffirmed that section 5(b) should be interpreted according to its text. There, the employer accepted reimbursement of its workers' compensation payments after plaintiff obtained a successful verdict in his personal injury suit. Rather than pay the statutory fees and costs from the gross distribution as prescribed by section 5(b), the employer insisted that it could deduct its contribution liability from the reimbursement and calculate section 5(b) costs and fees on the difference.

This court rejected the employer's reading of section 5(b). The employer's plan would force plaintiff's counsel to "subsidize [an employer's] lack of due care," since the

greater the employer's contribution liability, the more the employer could deduct from the reimbursement and, correspondingly, the smaller the amount employer would owe to plaintiff, particularly in terms of attorney fees. The court found that justification for its holding lay in the unadorned terms of section 5(b). *Silva*, 183 Ill. 2d at 366; see also *Ramsey*, 175 Ill. 2d at 237-38; *Branum v. Slezak Construction Co.*, 289 Ill. App. 3d 948, 966 (1997) (obligation to pay fees and costs dependent on reimbursement).

In the instant case, the appellate court characterized the timing of Banner's lien waiver as a "gamble" and stated that Banner only decided to waive the lien after plaintiff won the underlying lawsuit and it became apparent that, absent waiver of the lien, Banner would be liable for litigation expenses under section 5(b). 293 Ill. App. 3d at 275. The appellate court implied too that, by waiting until after the verdict to waive its lien, Banner essentially received the benefit of the employee's lawsuit (*i.e.*, a money judgment against the defendants), while avoiding the price demanded for that benefit by statute. According to this reasoning, whether the employer actually demands reimbursement for its workers' compensation payments or not is irrelevant: merely having the right or possibility of reimbursement following a verdict for the injured employee is enough to trigger the obligations of the employer under section 5(b).

We think that the appellate court misconstrued section 5(b). The "benefit" that obligates an employer to pay section 5(b) fees and costs is actual reimbursement, not merely the *possibility* of reimbursement. Stated differently, the premise animating section 5(b) is that an employer should not get "something" (a reimbursement on workers' compensation payments) for "nothing." Yet if the employer never demands the "something," then no unfairness occurs.

Also, we find nothing inherently unfair in Banner's strategy. Nothing in section 5(b) required Banner to waive the lien by a date certain if it wanted to forgo payment of statutory fees and costs. There is no record evidence, either, that plaintiff relied on Banner's potential liability for fees and costs in making his own decision to file the underlying personal injury lawsuit. Indeed, plaintiff must have known from the outset that, if plaintiff's own "gamble" in filing suit failed, plaintiff would have borne the sole responsibility for the cost of bringing the suit. Further, although plaintiff's expenses, including attorney fees, presumably increased with the return of a favorable jury verdict, the fund from which plaintiff would have to pay those expenses was greater, as well.

Plaintiff also characterizes Banner's decision as a calculated venture that allowed Banner to minimize its liability for plaintiff's injury. Specifically, plaintiff maintains that Banner did not want to waive its lien before trial even though waiver would have won Banner dismissal from Kemlite's third-party action for contribution. *Lannom*, 158 Ill. 2d at 543. According to plaintiff, Banner decided to waive the lien only after the jury returned a contribution verdict against Banner that exceeded the amount of Banner's lien, and Banner decided that it would be most advantageous to waive the lien, exploit the *Kotecki* cap placed on liability for contribution, and avoid fees and costs prescribed by section 5(b).

As stated previously, plaintiff cites no authority that would bar plaintiff from minimizing its exposure in a lawsuit. We are reluctant to dictate trial strategy to any litigant when that strategy is entirely consistent with controlling statutes and prior decisions of this court. We note as well that regardless of when Banner waived its lien, its contribution liability was always capped at the

same amount. Whether Banner waived its lien before or after the verdict, *Kotecki* and its progeny limited the maximum contribution liability for Banner to the amount paid by Banner in workers' compensation.

Without citation to authority, plaintiff argues that a result affirming the circuit court will frustrate the Contribution Act. However, the result we reach today is consistent with prior decisions of this court. In *Kotecki v. Cyclops Welding Corp.*, 146 Ill. 2d 155, 162-65 (1991), we stated that the Contribution Act and Workers' Compensation Act are distinct statutory schemes and the operation of one may not always complement the operation of the other. Sometimes, we will tolerate a result that partially frustrates the legislative purpose underlying the Contribution Act if, by doing so, we allow the workers' compensation statute to operate as intended. *Kotecki*, 146 Ill. 2d at 164 (capping contribution liability at the amount of the employer's workers' compensation obligation "arguably strikes a balance between the competing interests of the employer, as a participant in the workers' compensation system, and the equitable interests of the third-party plaintiff in not being forced to pay more than its established fault"). The implementation of section 5(b) in this case is one of those instances in which we will knowingly curtail operation of the Contribution Act.

Plaintiff further views a post-verdict waiver of a workers' compensation lien as a disincentive to settlement. Plaintiff apparently means that he could not have settled with Kemlite until he knew absolutely how much money he could obtain from his employer for his injuries, without fear of having to pay back that money in the event the plaintiff prevailed in his personal injury action. Plaintiff's premise is flawed, however, since nothing legally prevented plaintiff from settling with Kemlite, regardless of Banner's refusal to waive its lien. Moreover, there was no assurance that, if the lien was waived, the

plaintiff would have automatically settled with the defendant. Depending on the degree of confidence plaintiff had in his case, plaintiff could have accepted the waiver and still proceeded to trial against Kemlite. Just because plaintiff could not negotiate from his most advantageous pretrial position, plaintiff was not precluded from settling with Kemlite, if he wanted to.

Finally, we note practical difficulties latent in the appellate court's holding. If an employer could no longer waive its lien after verdict, up to what point in the litigation would waiver still be acceptable? Before trial begins? On the eve of the jury verdict? If an employer wants to waive the lien at the close of the plaintiff-employee's case, has plaintiff so committed himself (by retaining a lawyer, for example, and hiring expert witnesses) in terms of "fees and costs" that the employer should no longer be allowed to disentangle himself from the litigation by waiving its lien? What if, by waiving the lien, the employer will eliminate the need for a third-party contribution action and thereby reduce the time devoted to trial? We believe that these hypotheticals illustrate why we should be reluctant to depart from the text of section 5(b), and why we should interpret the statute according to its clearly stated terms.

### C. Whether the Circuit Court Abused its Discretion by Instructing the Jury on Plaintiff's Claim of Future Lost Income

Of the $1,122,261.21 damage award returned by the jury, $292,026.40 was allocated for plaintiff's claimed future lost earnings. On appeal to the appellate court, Kemlite urged the court to reverse and vacate that award. Kemlite maintained that the trial court erred "by instructing the jury regarding future lost earnings and by allowing the jury to calculate [plaintiff's] future lost earnings." 293 Ill. App. 3d at 272. The appellate court ruled that the evidence yielded no "reasonably certain

proof as to [plaintiff's] continued incapacity" (293 Ill. App. 3d at 273) and reversed the jury award as to this element of damages. On cross-appeal before this court, plaintiff argues that the appellate court erred in vacating plaintiff's future lost income award.

"A litigant has the right to have the jury clearly and fairly instructed upon each theory which [is] supported by the evidence." *Leonardi v. Loyola University*, 168 Ill. 2d 83, 100 (1995); *Ervin v. Sears, Roebuck & Co.*, 65 Ill. 2d 140, 145 (1976); see also *Shaheed v. Chicago Transit Authority*, 137 Ill. App. 3d 352, 360 (1985). " 'Whether the jury would have been persuaded is not the question. All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction.' " *Leonardi*, 168 Ill. 2d at 101, quoting *Lowe v. Norfolk & Western Ry. Co.*, 124 Ill. App. 3d 80, 118 (1984); *Wrighthouse v. Brown*, 52 Ill. App. 2d 191, 196 (1964). The evidence may be insubstantial; a reviewing court may not reweigh the evidence or decide whether a particular result is warranted. *Leonardi*, 168 Ill. 2d at 100. "The question of what issues have been raised by the evidence is within the discretion of the trial court." *Leonardi*, 168 Ill. 2d at 100.

A future lost earnings award compensates plaintiff for impairment of plaintiff's earning capacity. *Antol v. Chavez-Pereda*, 284 Ill. App. 3d 561, 573 (1996). Impairment of earning capacity is calculated by deducting the amount plaintiff is capable of earning after his injury from the amount he was capable of earning prior to his injury (*Antol*, 284 Ill. App. 3d at 573; *Patel v. Brown Machine Co.*, 264 Ill. App. 3d 1039, 1061 (1994)), and awarding plaintiff the difference. Expert testimony is not necessary to establish loss of future earning ability. *Patel*, 264 Ill. App. 3d at 1061. The plaintiff "may testify that his injuries diminished his capacity to work, and the appearance of [the] plaintiff on the witness stand and his

testimony as to the nature of his injuries and their duration is sufficient to take the question of impaired earning capacity to the jury." *Shaheed*, 137 Ill. App. 3d at 360; see also *Antol*, 284 Ill. App. 3d at 574. "[E]vidence that plaintiff's injury [is] permanent and that it prevented him from continuing employment [is] generally sufficient to permit a jury to arrive at a calculation of lost future wages." *Antol*, 284 Ill. App. 3d at 574; *Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.*, 217 Ill. App. 3d 94, 117 (1991) ("once plaintiff introduces evidence of permanent injury, the jury should be instructed as to loss of future earnings").

The appellate court vacated the award for lack of "reasonably certain proof" to sustain the claim of lost future earnings. 293 Ill. App. 3d at 273. The appellate court derived this standard from *Brown v. Chicago & North Western Transportation Co.*, 162 Ill. App. 3d 926 (1987), in which the appellate court was asked to decide whether evidence adduced at trial sustained the jury award. *Brown*, 162 Ill. App. 3d at 927. The quantum of proof necessary to *prevail* on a claim is different, however, from the measure of evidence needed merely to send an issue to the jury. See *Patel v. Brown Machine Co.*, 264 Ill. App. 3d at 1062. As stated above, plaintiff need only furnish "some evidence" probative of his claim to earn a jury instruction on that claim, and neither the trial court nor a court of review must be convinced of the persuasiveness of that evidence before the issue may be submitted to the jury for its deliberations. Indeed, after ruling that damages for lost future income would be awarded only on a showing that the loss was reasonably certain to occur (*Brown*, 162 Ill. App. 3d at 936-37), the *Brown* court stated: "In addition, there must be an evidentiary basis in order for a court to give a jury instruction on future disability and lost wages." *Brown*, 162 Ill. App. 3d at 937. Thus, even the *Brown* court recognized,

albeit implicitly, the narrower margin of proof required at the instruction conference.

We note as well that the *Brown* court's estimation of proof necessary to justify the damage award arose in the context of a discussion about conjectural and speculative evidence. The *Brown* court quoted authorities ruling that " '[m]ere surmise or conjecture' " is insufficient proof of an existing fact or future condition. *Brown*, 162 Ill. App. 3d at 936-37, quoting *Stevens v. Illinois Central R.R. Co.*, 306 Ill. 370, 377 (1922). We agree. Our conclusion that "some evidence" of a claim will get that claim to a jury does not mean that the evidence can be untrustworthy and still earn an instruction. While only "some evidence" is needed to warrant an instruction, inherently that evidence must be reliable and grounded in more than mere possibilities. See *Lewis*, 217 Ill. App. 3d at 117.

In support of his claim in this case, plaintiff introduced the testimony of Dr. Timothy Payne, an orthopedic surgeon and physician. He first treated plaintiff on June 29, 1990. At that visit, plaintiff reported that he had slipped and fallen on some fiberglass and injured his lower back. At the time Payne saw plaintiff, plaintiff was not working. Plaintiff related a history of a single, prior back injury to Payne, and also indicated he had had occasional aches and pains in his back prior to the fall of June 1990, although he did not indicate that prior to 1990, he had any difficulty functioning.

Upon examination, Payne found plaintiff had limitation in the range of motion in his lumbosacral spine. Plaintiff complained of pain on palpitation in the midline of the lower back, as well on the right and left sides of the spine. He had decreased sensation in his left foot and ankle.

Payne concluded from X rays that plaintiff had a "long-standing, significant degenerative condition in his low back at the time he presented to [Payne] on June 29,

1990." Payne opined that the degenerative process "facilitated [plaintiff's] complaints of pain and enhanced his discomfort" following the fall in June 1990. The fall triggered protracted pain, which resulted in plaintiff's receiving treatment.

Payne initially treated plaintiff with anti-inflammatory medications and epidural injections in an attempt to relieve plaintiff's pain. After approximately two years, Payne determined that his conservative treatment of plaintiff's back—therapy, medication, injections, myelogram, rigid external back brace—was inadequate, so he sent him to Dr. Kamal Ibrahim for a surgical consultation. Dr. Ibrahim performed a spinal fusion on plaintiff.

Following the surgery, plaintiff wore a brace for a period of time, progressed to "conventional therapy" to promote flexibility in and strengthen the lower back, and then went to a work-hardening program. When Payne saw plaintiff in October 1993, he found that plaintiff had "done well" in the work-hardening program. Based on plaintiff's performance there, Payne felt plaintiff could return to his original job if it was available: plaintiff had good flexibility, he could lift 25 pounds and intermittently 50 pounds, and plaintiff did not have the complaints of pain he had prior to surgery. Payne also believed that these weight restrictions on plaintiff are permanent.

Payne admitted that there is a trade-off with the surgery of the type performed on plaintiff. While the fusion relieved his pain, it also resulted in a loss of motion in the back. After reviewing Banner's written description of the activities required of a roll-off driver, including lifting requirements, Payne agreed that plaintiff was "on the cusp or border of [the] physical requirements" of the job. He also stated that he recommended a trial return to work to see if plaintiff could tolerate it.

Based on plaintiff's performance in the work-

hardening program, Payne believed that the lifting aspects of plaintiff's job "would be no problem," although Payne did admit that he could not predict what would happen if plaintiff was back in his job and faced with a situation where "he might have to do more." Payne believed that "there is always [the] possibility" that plaintiff might not be able to perform the duties of a roll-off driver, but based on Payne's exam of plaintiff on January 12, 1994, [plaintiff's] weightlifting capabilities fell within the parameters of the job, [plaintiff] had no complaints of back or leg pain," and Payne could not say that plaintiff could not do the job. The last time Payne saw plaintiff, plaintiff had no complaints of pain in his back or legs, "other than some aches and pains." Payne said these aches and pains were no major problem. Payne's notes of that visit also indicated that plaintiff had "done quite nicely since he had surgery."

Payne testified that the fusion of plaintiff's spine would not preclude him from engaging in "everyday activities" like sitting, standing, walking, carrying suitcases upstairs, yard work, helping someone move or shoveling snow.

Payne admitted that if plaintiff should come back to him after attempting to perform as a roll-off driver and told Payne that, despite plaintiff's ability to perform in the controlled setting of a work-hardening program, plaintiff could not do the work of a roll-off driver, then Payne would say, "Fine, then obviously you can't do it. I wouldn't pursue it."

Dr. Payne stated that plaintiff was a good patient who followed his directions. Payne agreed that, during the presurgery period, plaintiff was "working hard to try and get himself back to work."

Beginning in October 1992, Dr. Kamal Ibrahim, an orthopedic surgeon, treated plaintiff. Plaintiff came to see Ibrahim at the recommendation of Dr. Payne. Ibra-

him testified that plaintiff complained of lower back pain with occasional radiation and numbness down both legs, all the way to the ankles. Dr. Ibrahim determined that plaintiff had degenerative changes in his lower back that predated his fall. However, prior to June 1990, plaintiff had been "functioning without symptoms." The injury of June 1990 aggravated the preexisting condition, so that "[t]he fall brought on the symptoms that he complained of." He performed surgery on plaintiff, which included an internal fixation of the affected area of the spine, with rods and screws. He also fused several vertebrae of plaintiff's spine together, from L-3 to the sacrum, using bone grafts from plaintiff's hip.

In Dr. Ibrahim's opinion, plaintiff had exhausted all other, more conservative alternatives to surgery before surgery was performed in February 1993.

After the surgery, plaintiff went through a period of physical therapy, a rehabilitation program and a work-hardening program. Dr. Ibrahim last saw plaintiff in October 1993, after plaintiff completed work hardening. The fact he completed the work-hardening program indicated to Dr. Ibrahim that the surgery had been a success. "It fused very well and it eliminated his symptoms." He said he had no plan to remove the hardware from plaintiff's back.

Dr. Ibrahim had no record of restrictions or limitations that he specifically placed on plaintiff post-surgery. However, he testified that he generally tells his patients not to lift more than 50 pounds above the waist or 20 pounds over the head. This is to avoid putting extra pressure on the nonfused spine. Dr. Ibrahim's records do indicate that he told plaintiff to go back to work after plaintiff reported the results of the work-hardening program.

Plaintiff is 51 years old and currently lives in a trailer park. Six months before trial, he sold his home in Joliet

and moved into the trailer park in Tennessee. At the time of trial, he was living off the proceeds of the sale of his home.

Plaintiff left his family's home in Tennessee when he was 17. He started working for Banner in 1969, when he was 24 years old. Before that, he briefly worked as a laborer for a glass company, an automobile bumper manufacturer, a roofing materials manufacturer and a bakery. Each of those jobs required lifting.

At Banner, plaintiff worked first as a garbage man on a residential route. After three years, plaintiff became a roll-off driver. On the day of the accident, June 22, 1990, plaintiff slipped and fell as he was attempting to remove the compactor container from the Kemlite site. He felt a sharp pain radiating across his back and down both legs to his feet. He hauled that container and two more that day, despite feeling pain in his back; the pain got worse during the course of the day. He went to a clinic for treatment on both June 22 and June 25, 1990. He never went back to work for Banner after June 22, 1990. Prior to the fall, he had three injuries to his back, but he would not characterize any of them as a major problem, nor were they incidents that in and of themselves caused him any pain. He received treatment from Dr. Payne for two years, but still experienced difficulties with his back and legs. Plaintiff suffered from numbness in his legs, difficulty sleeping and inability to walk one block. Plaintiff testified that he "couldn't do anything."

Prior to his surgery, plaintiff obtained employment as a security guard for two or three months. The job required him to walk rounds around the facility he was guarding, and the pain and numbness in his legs and back prevented him from doing the necessary walking.

Following his surgery, plaintiff was incapacitated for two months. Thereafter, he wore a back brace for four months, and then completed physical therapy. After

completing a work-hardening program, plaintiff believed he was ready to return to work. Both Drs. Payne and Ibrahim released plaintiff to return to work without restrictions. However, Banner would not allow him to work because he had been off work for more than one year.

Plaintiff averred that he has tried to return to work since his surgery. Plaintiff tried bartending but was unsuccessful. He stated that his back still bothers him too much to "do a day's work." He has also tried to do work similar to that of a roll-off driver. His brother owns a junkyard and plaintiff tried for two months to drive a tow truck for his brother's business. Driving the tow truck, or "wrecker," is similar to being a roll-off driver, because it requires the driver to do many of the same activities—getting in and out of the cab, bending over, lifting. He said he lacked the flexibility necessary to do the job and could not drive for long periods of time.

He would like to return to work as a roll-off driver. Before his injury, he had planned on retiring at age 60 or 62. Currently, however, he has no other plans for employment. He does nothing on a day-to-day basis other than yard work around his home. Plaintiff stated that he is trained only for "plant work" and driving a truck. As for his back, he still has pain there, but he can live with it. He cannot bend over as he could in the past. He no longer has pain in his legs and he is not regularly taking any prescription medications. He is not regularly seeing any doctor for back treatment.

Prior to his injury on June 22, 1990, plaintiff earned $13.77 per hour, or $35,000 per year, as a roll-off driver. He also worked overtime, for which he received time and a half. Plaintiff said that he received no pay for the work he performed as a tow truck driver for his brother. He was "trying to see if he could give [his brother] a hand and help out." As a bartender, he earned $5 to $6 per

hour. He received approximately the same salary as a security guard.

The "some evidence" standard controlling our inquiry requires plaintiff to scale only a modest evidentiary threshold. We hold that plaintiff satisfied that standard in this case. Admittedly, Banner refused to re-employ plaintiff for reasons only indirectly related to plaintiff's back injury, and plaintiff did not indicate that he has approached his union, the Teamsters, for help in obtaining employment. Further, plaintiff produced no proof that he has actually applied elsewhere for employment as a roll-off driver. Nonetheless, plaintiff testified that he unsuccessfully tried to drive a wrecker for his brother, a job that plaintiff said required essentially the same tasks required of a roll-off driver. Although his attempt to work as a security guard occurred before the surgery that plaintiff said relieved some of his symptoms, plaintiff stated he was equally unsuccessful in his attempts to hold a job as a bartender.

The testimony of the medical witnesses indicated that plaintiff had permanent lifting restrictions placed on him as a result of the injury and subsequent surgery. The process of fusing portions of plaintiff's spine also forever limited his mobility. Even though plaintiff's treating physicians placed no restrictions on his ability to return to work, plaintiff's primary treating physician based his opinion solely on plaintiff's performance in a work-hardening program; he could not testify how plaintiff would perform in response to the exigencies of the real workplace.

Whether plaintiff presented sufficient evidence to actually prevail on this aspect of his damages case is not before us. The sole question presented to the appellate court, and on appeal to this court, is whether adequate proof existed to warrant a jury instruction for lost future earnings. We find that plaintiff produced at least some

evidence of a permanent injury that has prevented him from continuing his prior employment. The circuit court did not abuse its discretion by instructing the jury to consider whether plaintiff could recover this measure of damages, and if so, how to calculate those damages.

## CONCLUSION

For the reasons stated above, we affirm the finding of the circuit and appellate courts on the question of Kemlite's duty of care to plaintiff. We reverse the appellate court's ruling that invalidated Banner's post-trial waiver of its workers' compensation lien, and we reverse the appellate court's determination that the jury should not have been instructed on the question of plaintiff's alleged lost future wages and the calculation of those damages. The judgment of the circuit court is affirmed.

*Appellate court judgment affirmed in part*
*and reversed in part;*
*circuit court judgment affirmed.*

JUSTICE BILANDIC took no part in the consideration or decision of this case.

JUSTICE HEIPLE, dissenting:

While performing his job, the plaintiff, a trash collector, slipped and injured himself when he walked on a piece of fiberglass refuse (called edge trim) which he knew to be dangerously slippery. A jury found the defendant premises owner, Kemlite, liable for the plaintiff's injuries, and the appellate court affirmed.

Although a premises owner is not ordinarily liable for injuries caused by an "open and obvious" hazard (*Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 447-48 (1996)), the majority holds that the "deliberate encounter" exception to the open and obvious danger doctrine applies because Kemlite "could reasonably foresee an 'economic compulsion' [citation] imposed on the

roll-off drivers to perform the work they were hired to do." 185 Ill. 2d at 395. This "deliberate encounter" exception provides that a landowner may be liable for injuries sustained from open and obvious hazards when he should reasonably foresee that an entrant "will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." Restatement (Second) of Torts § 343A, Comment *f*, at 220 (1965).

While I have no objection to the majority's formal adoption of the deliberate encounter exception, I disagree with the majority's application of the doctrine here. Specifically, the majority holds that the deliberate encounter exception applies because Kemlite should have foreseen that the plaintiff was somehow economically compelled to traverse upon the dangerous trash. The facts in this case clearly reveal that the plaintiff was under no compulsion, economic or otherwise. Therefore, I respectfully dissent.

The plaintiff and other trash collectors testified that when refuse prevented them from performing their job safely, they would sometimes contact the Banner dispatcher. The dispatcher would then contact Kemlite and ask it to have the area around the compactor cleaned. Nothing indicates that the plaintiff would suffer adverse economic consequences if he did not deliberately encounter the debris on the ground. Indeed, past practice indicates that the trash collectors requested that Kemlite clean up the compactor site, and the collectors *were never disciplined by Banner for making such a request.* Rather, the collectors could, *and did,* avoid the danger by requesting that Kemlite clean the area around the compactor. Given that the plaintiff had a *reasonable alternative* available to him which he in fact availed himself of in the past, it strains logic and good sense to hold that he was under some compulsion to put himself

in harm's way. Consequently, Kemlite should not be required to foresee an illusory compulsion.

Moreover, the case to which the majority cites for support actually illustrates why the plaintiff in this case was *not* under any compulsion. In *Keller v. Holiday Inns, Inc.*, 107 Idaho 593, 691 P.2d 1208 (1984), the plaintiffs worked at a hotel gift shop. When opening and closing the shop, the employees, *as part of their jobs*, were *required* to move and store a hazardous security gate. Because the employees had to handle this gate or lose their jobs, the Idaho Supreme Court held that the employer should have foreseen this economic compulsion. *Keller*, 107 Idaho at 595, 691 P.2d at 1210. Thus, the plaintiffs in *Keller*, unlike the plaintiff here, *had no reasonable alternative* to encountering the hazard.

Finally, finding a duty under the circumstances of this case is bad public policy. See *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987) (stating that whether a duty exists is also an inquiry shaped by public policy). Whenever a hazard is open and obvious, the danger is known to both the plaintiff and the defendant. Thus, the central inquiry is who, among the two parties aware of the risk, should bear the responsibility for injury. Where, as here, reasonable alternatives to encountering the hazard are available to the plaintiff, finding a duty makes the defendant responsible for the plaintiff's decision which was freely made. Consequently, I would find that Kemlite owed no duty to the plaintiff, and, thus, I would not reach the remaining issues in this case.