NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200313-U

NO. 4-20-0313

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 19, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ROGER MAIN, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| ADM MILLING CO., and | ) | No. 16L129 |
| ARCHER DANIELS MIDLAND COMPANY, | ) | |
| Defendants-Appellants. | ) | Honorable |
| | ) | Albert G. Webber, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justice DeArmond concurred in the judgment.
Justice Harris specially concurred.

**ORDER**

¶ 1     *Held*: (1) The verdict finding plaintiff had no comparative fault in a premises-liability, deliberate-encounter case is not legally inconsistent with a verdict against defendants.

(2) The verdict finding no comparative fault is not against the manifest weight of the evidence.

(3) The verdict does not exceed flexible limits of fair and reasonable compensation.

¶ 2     In April 2015, plaintiff, Roger Main, suffered an injury while on the property of defendants, ADM Milling Co. and Archer Daniels Midland Company. Plaintiff sought relief through a negligence claim against defendants, asserting, in part, defendants could reasonably expect a reasonable person in plaintiff's position, knowing of the condition on the property that

created a risk of harm, would proceed to encounter the condition as the advantage of doing so outweighed the apparent risk. Defendants appeal, arguing (1) the verdict finding no comparative fault by plaintiff is legally inconsistent with a verdict on plaintiff's premises-liability, deliberate-encounter claim against defendants; (2) the verdict of no comparative fault is against the manifest weight of the evidence; and (3) the $450,000 verdict exceeded flexible limits of fair and reasonable compensation. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Plaintiff worked as a truck driver for Pike Feeds, Inc. On the evening of April 8, 2015, plaintiff drove to a St. Louis facility owned and operated by defendants to pick up a load of wheat midds for his employer. After his truck was loaded and weighed, plaintiff exited his truck while it was on a scale, stepped from his truck onto a blue pipe in an open trench, slipped, and fell.

¶ 5        In December 2016, plaintiff filed a complaint, seeking damages for injuries he sustained as a result of the fall on defendants' property. Plaintiff alleged, in part, defendants negligently "failed to provide a reasonably safe means of ingress and egress at its scales for truck drivers" and failed to add a proper walkway to cover the open trench.

¶ 6        In their answer, defendants raised the defense of comparative negligence. Defendants asserted plaintiff failed to maintain proper lookout for the surface conditions at the premises and decided to take a pathway when the condition could have been avoided and alternative exit points were available.

¶ 7        At the February 2020 trial, plaintiff's first witness was Jay Griffin, area safety manager with "ADM." Griffin testified one of his roles was to make the St. Louis Mill and its

operation reasonably safe. In 2015, the St. Louis Mill had a staging area, where an outside driver would pull into the facility to load or unload wheat. The staging area had a scaling area where trucks were weighed. In the scaling area, adjacent to the scaling surface, were metal grates used as walkways over a trench. The metal grates did not cover the entire trench, there were "sections of that scale *** where there [were] openings" that were "about a foot-and-a-half, two feet" below the surface.

¶ 8 According to Griffin, drivers who dumped wheat at the St. Louis Mill would arrive with a fully loaded truck and drive onto the scale "to get scaled." After being weighed, the drivers backed up to dump their wheat. For those drivers, "it is at that location for the dumping of the wheat where there [was] metal grating." The grating was part of a movable walkway. When drivers arrived to load wheat midds, as plaintiff did, drivers, when out of their trucks, may encounter wet wheat midds that resulted from spillage during "the shakedown process." After wheat midds were loaded on the truck, the process required the driver to exit the truck and to collect paperwork from the scale house. Drivers were told what to do through a one-way intercom from the scale house to the scale. At the end of the scale, on the driver's side to the left was an uncovered trench. A metal grate could have been placed there.

¶ 9 Michael Hahn, a feed loader with "ADM," testified in April 2015, he worked the third shift at the St. Louis facility. Hahn was working on the day plaintiff fell. When drivers arrived at the St. Louis facility, they would pull into a parking lot, circle around, stop in front of the scale, exit their trucks, and walk into the scale house. In the scale house, the driver would provide the feed loader with their order number. The feed loader would record the license-plate number from the trailer of the truck. The driver would sign in. The check-in process lasted

approximately five minutes. Hahn instructed new drivers to pull up to the scales so he could weigh them. First, an empty trailer weight was taken. To accomplish this, the driver pulled up to the end of the scale to get weighed. The driver waited for instructions over the intercom. After the empty weight was taken, the driver drove to the loading facility. The feed loader met the driver there, directing the driver where to park. The loading process took 45 minutes to an hour-and-a-half. During this time, the driver was often told to move up and move back to ensure the entire trailer was filled. Before the driver left the loading facility and returned for a loaded weight, he performed a "shakedown," meaning he pulled forward and hit the brakes to settle the product and covered the product with a tarp. After the truck was loaded and tarped, the driver returned to the truck and drove the truck to the scaling area. The driver pulled his truck up to the end and waited to hear from the feed loader. If the weight was enough, the feed loader told the driver to "come on up and get your paperwork."

¶ 10        Hahn testified, in 2015, drivers would leave their truck on the scale and retrieve the paperwork from the scale house. Hahn was aware an uncovered trench was outside the truck driver's door. Hahn was further aware there was a movable walkway behind the truck. As long as another truck was not waiting to be weighed, Hahn did not care whether the driver left the truck on the scale while he or she retrieved the documents. Hahn acknowledged wheat midds were on the ground in the loading facility. From time to time, those midds would be wet from rain. Wheat midds were slippery when wet. At times, Hahn would clean up the wheat midds. To clean his own boots of wheat midds, Hahn simply walked them off.

¶ 11        On April 8, 2015, Hahn did not see plaintiff fall. When plaintiff arrived at the scale house, he told Hahn that he fell. Two to four days later, plaintiff reported to Hahn he hurt

- 4 -

his back when he fell and told Hahn he maybe "was having [a] problem with his leg." Plaintiff showed Hahn the bruising.

¶ 12　　　　Hahn testified he did not tell plaintiff to leave his truck on the scale before entering the scale house. Usually drivers pulled off the scale before exiting their trucks to walk to the scale house. The open trench next to the scale was visible. To avoid that trench, the driver needed to pull forward maybe six to ten feet. Hahn denied telling any driver they could not pull forward. During the eight years between 2007 and 2015 when he was a feed-load operator, no driver complained about the conditions they faced when exiting their trucks to go to the scale house.

¶ 13　　　　Les Eyman, an employee of "ADM," testified he was a feed-load operator at the St. Louis facility in 2015. "Possibly" before April 2015, Eyman had concerns about the uncovered trench. "At times" other drivers commented on the trench. Eyman relayed those concerns as well as his own concerns to a supervisor at the plant. Eyman estimated the trench was "[p]ossibly, two to two-and-a-half" feet deep. The supervisor's response was to move the movable walkway, a metal grate, that was next to a section of the left side of the scale. Eyman tried to move the walkway, but it would not move as the wheels would no longer roll. Eyman believed some grating over the uncovered trench would help drivers who were not often at the facility.

¶ 14　　　　According to Eyman, there was nothing at the St. Louis facility to distract a driver from seeing the trench. Most drivers, according to Eyman, pulled "off the scale before they would walk up to the scale shack" without being told to do so. Eyman agreed it was acceptable for drivers to leave their trucks on the platform scale after receiving final weight as they exited

their trucks to enter the scale house for paperwork.

¶ 15      Dr. Matthew Gornet, an orthopedic surgeon whose practice was devoted to spinal surgery, testified regarding his treatment of plaintiff after the April 2015 fall. Plaintiff reported he was injured at work. Plaintiff was standing on something described as a "scale beam" about four feet above the ground, and he had wheat on his shoes. Plaintiff slipped, fell, and landed backwards on his left side after hitting a concrete wall. Dr. Gornet believed plaintiff went to the emergency room after the fall. He was told to see his primary care physician, but plaintiff opted to wait to see a specialist. The first available appointment was four-and-a-half months or so after the injury.

¶ 16      Dr. Gornet reviewed plaintiff's X-rays and a computed tomography (CT) scan. No significant arthritis was revealed. A magnetic resonance imaging (MRI) scan revealed plaintiff suffered a disc injury "at L4-5" and a tear in the disc at L5-S1. The MRI also revealed some degeneration, a normal part of the aging process. Dr. Gornet explained discs that were "a little bit degenerative get injured because they are a little weaker." Dr. Gornet recommended plaintiff continue working as plaintiff's "symptoms got where we need[ed] to go" and plaintiff should receive physical therapy, which plaintiff did. Dr. Gornet felt physical therapy was helping.

¶ 17      After the second round of physical therapy, plaintiff plateaued and was still experiencing symptoms. Dr. Gornet recommended a cortisone shot. The purpose of the cortisone shot was to limit the inflammatory response to the injury, which oftentimes eliminated the need for further immediate treatment. Cortisone shots would not repair the injury; the "loss of structural integrity remains." Plaintiff had cortisone injections at both locations of the disc

injuries in January and February 2016. The cortisone injections "made a big difference."

¶ 18		According to Dr. Gornet, he last saw plaintiff in December 2016. Plaintiff's symptoms "were tolerable, but he had more pain with increased activity." Dr. Gornet believed plaintiff's injuries were permanent. Dr. Gornet told defendant to "watch this, continue to work full duty" and return if needed. Dr. Gornet concluded plaintiff's symptoms, his treatment requirements, and his injury were caused by plaintiff's April 2015 fall.

¶ 19		Plaintiff testified on his own behalf. Plaintiff was 60 years old. For 10 to 12 years, plaintiff drove an ingredients truck for Pike Feeds, which made cattle, hog, and rabbit feed. Plaintiff drove the truck from Pike Feeds to the ADM facilities in Decatur, Quincy, and St. Louis. Plaintiff drove to Decatur ADM around three times a week. He drove to Quincy every day. Plaintiff had not been to the St. Louis facility since 2015.

¶ 20		According to plaintiff, the first time he went to the St. Louis ADM facility was toward the end of March 2015. Plaintiff had gone to that facility to pick up wheat midds five or six times before his fall on April 8, 2015. On April 8, 2015, plaintiff worked third shift. He left from Pike Feeds in Pittsfield, Illinois, around 9 p.m. for the scheduled pickup at the St. Louis facility. Upon arrival at the St. Louis facility, plaintiff would pull through the gate, drive around the scale house and guard shack, and approach a doorway. There, plaintiff stopped his truck, climbed the steps, and checked in. Hahn then would tell plaintiff to pull up to the scales. On April 8, it was raining. Plaintiff had to wait in line as other drivers were there. At the scale, to get an empty weight, the driver pulled up to the end of the scale, stopping at the last blue line. After the empty weight was taken, the driver went to the loading facility by pulling out of the gate and making a left. The driver went about eighty feet and turned into a building. Upon arrival to the

loading facility, Hahn would tell the driver when to stop. From the intercom, Hahn would tell the driver when to pull forward or back up. At the end of the loading, Hahn would tell the driver to "shake it down" and then return to the scales. Plaintiff would exit his truck to roll the tarp over the load. On April 8, 2015, when plaintiff exited his truck to cover the truck, he noticed wet wheat midds on the ground. After plaintiff walked through the midds to tarp his truck, before climbing into his truck, plaintiff kicked his boots against the steps and then rubbed the bottoms of his boots on the metal grating on his truck step to scrape his boots. The wheat midds were slippery. Plaintiff had no difficulty getting back into his truck at that time.

¶ 21          After leaving the loading facility, plaintiff drove around the scale house, pulled up to the end of the scales, and waited for Hahn. The scale was "very narrow." With a semi-truck on it, "there's not a foot-and-a-half of room on it on the width." A "weight monitor" informed the driver of the weight. Hahn would ask if the weight was sufficient. If it was, the driver exited the truck, approached the scale house, signed paperwork, retrieved paperwork, and left. Plaintiff went through this procedure at Hahn's direction each time he picked up wheat midds from the St. Louis facility. At no point did anyone tell him not to exit his truck on the scale.

¶ 22          On April 8, 2015, plaintiff opened the door to back down the two steps of the truck. While doing so, plaintiff held onto the handle on the side of the truck cab. From the bottom step of his truck, plaintiff stepped down to put a foot on the pipe. "[W]hen I put the other one on there to let go, that's when I fell." Plaintiff stepped onto the blue pipe, which was about two feet down inside the trench. There was nowhere else for plaintiff to step. Plaintiff slipped off the pipe and fell back against the wall. He hit his head on the gravel. Plaintiff's glasses fell off. After lying there "for awhile," plaintiff "got up, went to the scale house," and "got [his]

- 8 -

paperwork."

¶ 23       Plaintiff testified he reported the fall to Hahn and showed Hahn his back. At the time, plaintiff felt "pretty numb." On the way home, plaintiff began feeling pain. "It hurt down the side clear to my leg." He continued to work that day. The next day, plaintiff could not urinate. He decided to seek medical treatment at that point. Plaintiff had "very bad bruising" on his back and left side down to his foot.

¶ 24       Plaintiff ultimately saw Dr. Gornet, who recommended physical therapy. Plaintiff's physical therapy was over a period of six weeks. Plaintiff went three times each week, approximately an hour each time. During physical therapy, his muscle was stretched in his back. The physical therapy "helped a lot." Plaintiff stopped going to physical therapy after receiving the injections.

¶ 25       When asked about the questionnaires he completed over the three- or four-month period when he was doing physical therapy, plaintiff explained his reports of the level of his pain depended on the time of day he had his physical therapy and the number of miles he had driven that day. After receiving the injections, plaintiff felt better. After 10 or 15 days, the pain would return. That pain included a sharp, burning feeling that radiated down the left side of plaintiff's back and down his leg. Sitting would bring on the pain. Getting up and moving around helped subside the pain. Plaintiff continued to work, but his pain had gotten worse since the accident. When he drove the two-and-a-half hours to St. Louis, plaintiff would have to stop twice to walk around.

¶ 26       According to plaintiff, he had difficulty pushing a broom, lifting feed bags, and turning and twisting to stack the bags. For his work, he would have to sweep daily. Plaintiff had

to lift bags about twice a week. Plaintiff could no longer perform the responsibility of scooping corn.

¶ 27        As for recreational activities, plaintiff could no longer play baseball or kickball or ride the four-wheeler with his grandchildren. Plaintiff had to give up walking his dog, as the dog would jerk the leash and cause him pain. Plaintiff could no longer sleep on his back. In the morning, he would roll himself off the bed and walk 15 to 20 feet to "limber" his back. Plaintiff took Tylenol four times a day. Since the accident, he gained 20 to 25 pounds.

¶ 28        On cross-examination, plaintiff testified he was an experienced driver who had been weighing and loading trucks long before his accident. Plaintiff was aware there was an open trench next to the scale. Plaintiff had seen that area and negotiated that pathway before. He had intended to step on that pipe when he was at the facility on April 8, 2015.

¶ 29        When asked if he knew he had wheat midds on his boots, plaintiff stated "[he] cleaned them off the best [he] could when [he] loaded." Plaintiff knew they were slippery, which is why he cleaned them off. Plaintiff, when he first put his feet on the pipe, held onto the handle of his truck "[t]o keep from falling." Plaintiff was aware there was a risk. He let go of the handle one hand at a time. There were no wet midds on the pipe when plaintiff stepped on it. Plaintiff admitted the front of his trailer was six to ten feet from being off the scale. When he was asked if he had pulled the trailer up those six to ten feet would he have been able to avoid the trench, plaintiff responded, "[n]o one said I could do that." He acknowledged no one told him he could not. Plaintiff testified the condition was not dangerous the other four or five times he encountered it. When defendants' counsel asked, "it wasn't the condition that was dangerous, it was the wet midds on your boots that caused this fall," plaintiff agreed. Plaintiff testified the pipe

was wet.

¶ 30    From the scale, to get to the scale house, plaintiff had to walk up 80 feet and a set of stairs. He did so after the fall. Plaintiff also returned to his truck, stepping on the blue pipe to do so. Plaintiff finished his shift, which included another delivery, despite falling.

¶ 31    Plaintiff's first two doctor visits were in Pittsfield. It took four months to see Dr. Gornet. At four months after the accident, plaintiff was not experiencing sleeping issues. Those issues developed over the four years since the accident. On September 24, 2015, plaintiff reported no pain at the time. He further reported his sleep was not disturbed by pain, he was able to care for himself, and he could lift things without extra pain. In November 2015, plaintiff reported no pain at the moment. He also had no issues in regard to his personal care. He had no pain with lifting, walking, or sitting. Plaintiff was not seen by another doctor for his back pain after Dr. Gornet. Plaintiff had not lost any wages as a result of the fall.

¶ 32    Exhibits entered into evidence included questionnaires plaintiff completed over the three or four months he was receiving physical therapy. On the August 2015 questionnaire, plaintiff checked boxes indicating his pain was "very mild at the moment," and, without extra pain, he could take care of himself normally, lift heavy weights, stand as long as he wanted, sleep without extra pain, maintain his normal sex life, and sit as long as he liked. Plaintiff reported he could travel anywhere but he experienced extra pain doing so. In October 2015, plaintiff reported moderate pain "at the moment." Plaintiff further reported, without extra pain, he could lift heavy weights, stand as long as he wanted, and maintain a normal social life. At that time, plaintiff's sleep was never disturbed by pain. However, activities that caused extra pain included looking after himself normally, having a sex life, and traveling. Plaintiff checked a box

indicating his pain prevented him for sitting more than one hour. In November 2015, plaintiff reported "no pain at the moment." Plaintiff checked boxes indicating pain did not prevent him from walking and he could sit and stand as long as he wanted. Without extra pain, plaintiff could lift heavy weights, care for himself, and maintain his sex life. Plaintiff also indicated his sleep was occasionally disturbed by pain and he could travel anywhere but traveling gave him extra pain.

¶ 33    The jury returned a verdict in plaintiff's favor and found plaintiff was not comparatively negligent. Plaintiff was awarded $300,000 for past and future pain and suffering and $150,000 for past and future loss of normal life.

¶ 34    In March 2020, defendants filed a posttrial motion seeking a new trial or remitter for damages award not exceeding $30,000. The trial court denied the motion.

¶ 35    This appeal followed.

¶ 36    II. ANALYSIS

¶ 37    A. Consistency of the Verdicts

¶ 38    Defendants first argue the verdict finding no comparative fault by plaintiff in a deliberate-encounter, premises-liability case is legally inconsistent with the verdict against defendants. Defendants contend if the deliberately encountered condition was found to be unreasonably dangerous to support their liability as owner of the premises, then plaintiff was guilty of comparative fault as a matter of law for failing to protect himself from the same hazard he chose to encounter. Plaintiff counters defendants cite no case law holding a finding of liability under the deliberate-encounter exception requires a finding of some degree of comparative fault by plaintiff. Plaintiff argues, instead, Illinois law shows the concepts are independent of each

other and the verdicts are not inconsistent.

¶ 39    Legally inconsistent verdicts are those in which the same element is found to exist

and not to exist based on the same set of facts. See *Redmond v. Socha*, 216 Ill. 2d 622, 649, 837

N.E.2d 883, 899 (2005). Verdicts that are inconsistent should be set aside. See *Galloway v. Kuhl*,

346 Ill. App. 3d 844, 849, 806 N.E.2d 251, 255 (2004). We review this matter, a question of law,

*de novo*. *Redmond*, 216 Ill. 2d at 642.

¶ 40    To prevail on a claim of negligence, a plaintiff must establish the defendant owed

a duty, the defendant breached that duty, and the breach was the proximate cause of the

plaintiff's injury. *American National Bank & Trust Co. of Chicago v. National Advertising Co.*,

149 Ill. 2d 14, 25, 594 N.E.2d 313, 318 (1992). Illinois law establishes the following regarding

the duty of land possessors to invitees as follows:

> " 'A possessor of land is subject to liability for physical harm
>
> caused to his invitees by a condition on the land if, but only if, he
>
>     (a) knows or by the exercise of reasonable care would
>
> discover the condition, and should realize that it involves an
>
> unreasonable risk of harm to such invitees, and
>
>     (b) should expect that they will not discover or realize the
>
> danger, or will fail to protect themselves against it, and
>
>     (c) fails to exercise reasonable care to protect them against
>
> the danger.' " *Ward v. K Mart Corp.*, 136 Ill. 2d 132, 145-46, 554
>
> N.E.2d 223, 229 (1990) (quoting Restatement (Second) of Torts
>
> § 343 (1965)).

- 13 -

Under the traditional rule, a possessor of land "an owner or occupier of land ha[d] no duty under any circumstances to protect entrants from conditions on his land of which the entrant knows and realizes the risk or which are obvious." *Id.* at 146.

¶ 41　　　　The traditional rule finding land possessors had no duty to protect invitees from open and obvious dangers is not, however, limitless. *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 390, 706 N.E.2d 441, 447 (1998). There are multiple exceptions, including the "deliberate encounter exception." (Internal quotation marks omitted.) See *id.* at 391. According to the deliberate-encounter exception, a possessor must guard against harm to his or her invitee, despite the openness or obviousness of the hazard, if the possessor " 'has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.' " *Id.* (quoting Restatement (Second) of Torts § 343A, Comment f (1965)). In this case, plaintiff asserts a claim under the deliberate-encounter exception, asserting defendants, as possessors of the land, were liable as they had a duty to protect plaintiff from injury, they breached the duty by failing to provide plaintiff a safe walkway and to provide adequate safeguards to prevent plaintiff's injury, and that breach is the proximate cause of plaintiff's injuries.

¶ 42　　　　We note defendants base their inconsistent-verdict argument on the conclusion the deliberately encountered, open-and-obvious condition "was found to be unreasonably dangerous." However, for recovery under the deliberate-encounter exception, the law does not require the deliberately encountered condition be "unreasonably dangerous," and the record shows neither the judge nor the jury made such a finding. Defendants cite no authority to support this contention. As shown above, no duty can arise under the deliberate-encounter exception

unless the possessor " 'has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.' " *LaFever*, 185 Ill. 2d at 391 (quoting Restatement (Second) of Torts § 343A, Comment f (1965)). "Unreasonably dangerous" is not part of the analysis.

¶ 43　　　　The question of whether a duty arises under the deliberate-encounter exception is one that is separate and distinct from the question of comparative negligence. The *LaFever* court acknowledged as much: "Nor is this opinion intended to dilute or minimize the relevance of comparative negligence or any other concept that may be applied when proof exists that the possessor of the property is not wholly responsible for the invitee's injury." *Id.* at 396; see also *Ward*, 136 Ill. 2d at 145 ("[T]he adoption of comparative negligence in this State has no effect on the basic duty a defendant owes to a plaintiff."). Tellingly, the two issues defendants argue were inconsistent are evaluated from different perspectives. *LaFever* establishes foreseeability as to a plaintiff's willingness to proceed to encounter the danger is judged from the perspective of what the landowner may reasonably expect of the invitee. *LaFever*, 185 Ill. 2d at 392-93. The *LaFever* court rejected the landowner's invitation to decide foreseeability by measuring the reasonableness of the invitee's actions and not those of the landowner. See *id.* at 393. In contrast, comparative fault is judged by the plaintiff's actions. One is contributorily negligent when he or she acts without the degree of care a reasonably prudent person would have used for his or her own safety under the circumstances and that action proximately caused the injury. *Zook v. Norfolk & Western Ry. Co.*, 268 Ill. App. 3d 157, 170, 642 N.E.2d 1348, 1358 (1994). Under the doctrine of comparative negligence, a plaintiff's damages are reduced by the percentage of fault attributed to him or her. *Johnson v. Johnson*, 386 Ill. App. 3d 522, 536, 898 N.E.2d 145, 159

- 15 -

(2008).

¶ 44 Given the law establishes the concepts are distinct and are to be analyzed from differing perspectives, it does not follow the verdicts must be found inconsistent if liability for a deliberate encounter is found but comparative negligence is not. The differing perspectives, in this case, show the same set of facts are not interpreted differently for each element. The question of duty depends at least in part on whether defendants could foresee a reasonable person in plaintiff's position would choose to encounter the condition because the benefits outweigh the risks. Facts relevant to this consideration include the communications from the feed loaders to the drivers and whether other drivers leave their trucks and approach over the same trench. In contrast, the question of comparative negligence relates to the actions the specific plaintiff took in listening to instructions, wiping his feet, holding the handle on his truck, and traversing the same pathway he had safely taken before. Because defendants have not established the same element is found to exist and not exist on the same set of facts, the verdicts are not legally inconsistent. See *Redmond*, 216 Ill. 2d at 649.

¶ 45 We note we disagree with defendants' contention in their reply brief because the *hazard* proximately caused an injury it is axiomatic both defendants and plaintiff failed to protect against the hazard. The question of whether an individual is negligent turns on the question of whether one acted with reasonable care. See, *e.g.*, *Ward*, 136 Ill. 2d at 145-46. Defendant has cited no authority for the proposition in premises-liability negligence cases the hazard itself creates liability.

¶ 46 We also find unconvincing defendants' reliance on the *LaFever* language "[t]he openness or obviousness of a hazard *will* have a bearing on the plaintiff's ultimate recovery

***." (Emphasis added.) *LaFever*, 185 Ill. 2d at 396-97. Contrary to defendants' argument, this language is not a determination comparative fault exists in all deliberate-encounter cases. The *LaFever* court did not consider that issue or review comparative negligence but addressed only whether a land possessor owed a duty to an invitee. See *id.* at 383-84. Moreover, the *LaFever* court cited *Ward* in support of its statement, and the *Ward* court expressly found "the fact a person's injury resulted from his encountering a known or open and obvious condition on a defendant's premises is a proper factor to be considered in assessing the person's comparative negligence." *Ward*, 136 Ill. 2d at 143 ("It is unquestionably relevant to whether the injured party was exercising a reasonable degree of care for his own safety."). The *Ward* court did not hold comparative fault must be found.

¶ 47        Defendants also misrely on *Rhoades* to establish plaintiff was comparatively negligent as a matter of law. The facts in *Rhoades* plainly establish the *Rhoades* plaintiff knew of safer choices available to him because he had traversed a safer route before electing to use the dangerous route, which involved climbing a dark stairwell littered with construction waste with no light. *Rhoades v. W. E. O'Neil Construction Co.*, 80 Ill. App. 3d 1117, 1119-20, 400 N.E.2d 1035, 1038 (1980). Here, no testimony establishes plaintiff knew he was permitted to take a safer route and plaintiff testified he was told to leave his truck, while it was on the scale, and proceed to the scale house.

¶ 48                          B. Comparative Negligence

¶ 49        Defendants next argue the verdict finding no comparative fault by plaintiff is against the manifest weight of the evidence. Defendants contend plaintiff admitted the facts that render his comparative fault plainly evident. Defendants emphasize plaintiff's testimony

- 17 -

showing plaintiff knew wheat midds were on his boots and the midds were slippery when wet, plaintiff controlled his truck and decided not to pull forward six feet to avoid confronting the trench, plaintiff knew he could fall if he let go of the handle on his truck but then let go, and he failed to clear the wheat midds before stepping on the blue pipe. Defendants further emphasize the fact no one told plaintiff he could not pull forward to avoid stepping into the trench.

¶ 50　　　　A plaintiff is contributorily negligent when he or she acts without the degree of care that a reasonably prudent person would have used for his or her own safety under like circumstances and that action proximately caused the injury. *Zook*, 268 Ill. App. 3d at 170. At trial, defendants had the burden of proving plaintiff was comparatively negligent. *Id.* at 169. The proper standard of review in a comparative negligence case is whether the verdict is against the manifest weight of the evidence. *Id.* We will find a verdict "against the manifest weight of the evidence when, after viewing the evidence in the light most favorable to the determination, we conclude no rational trier of fact could have made the same finding." *BNSF Ry. Co. v. Grohne*, 2019 IL App (3d) 180063, ¶ 86, 145 N.E.3d 381; see also *Zook*, 268 Ill. App. 3d at 169-70 ("A verdict is against the manifest weight of the evidence when the opposite conclusion is clearly evident or when the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence.").

¶ 51　　　　Under the facts adduced at trial, we cannot find the jury's verdict was against the manifest weight of the evidence. The jury could have decided plaintiff acted with the degree of care a reasonably prudent person would have for his or her own safety under like circumstances. The facts show plaintiff, knowing wet, slippery wheat midds were on his boots, wiped his boots on the grate on his truck. Plaintiff then, while sitting in his truck at the end of the scale, was told

- 18 -

through a one-way intercom to retrieve his paperwork, which required walking from the truck to the scale house. As he had done four or five times previously, plaintiff left his truck while it was on the scale to approach the scale house. This time, knowing he had stepped in wet midds, plaintiff held the handle on the truck as he stepped directly from his truck onto the pipe. The jury could have reasonably determined plaintiff was careful in his approach to the trench, followed defendants' instructions, and was not contributorily negligent.

¶ 52                                C. Amount of the Verdict

¶ 53        Defendants last argue the verdict of $300,000 for past and future pain and suffering and $150,000 for past and future loss of normal life was not supported by the facts in the record and the damages were out of proportion to the injury. Defendants highlight plaintiff had no economic loss from missing work. Defendants contend plaintiff had not had medical care for his pain in over three years, showing the pain was minimal. Defendants point to the physical therapy questionnaires as evidence showing the loss of normal life award lacked a reasonable basis. Defendants argue the award was "implicitly motivated by passion or prejudice *** against a large corporation," giving plaintiff the exact amount he requested. Defendants ask this court to order remittitur.

¶ 54        Plaintiff argues the $450,000 verdict was fair compensation for the damages he suffered for the prior 5 years and for the damages he would suffer for the next 21 years. Plaintiff emphasizes his injuries were permanent and the level of pain he suffered increased since the fall. Plaintiff further argues his daily activities and his ability to enjoy those activities were hindered by his injuries. Plaintiff points to his testimony showing almost every aspect of his life was affected by the injuries he suffered.

- 19 -

¶ 55        "The determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." *Richardson v. Chapman*, 175 Ill. 2d 98, 113, 676 N.E.2d 621, 628 (1997). We will deem a damages award excessive if the award "falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." *Id.* A court of review, when reviewing a compensatory-damages award for a nonfatal injury, "may consider, among other things, the permanency of the plaintiff's condition, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries." *Id.* at 113-14. In support of their position the damages award is excessive, defendants rely on the factors set forth in *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1064, 645 N.E.2d 284, 293-94 (1994), which include those in *Richardson* as well as the plaintiff's age, the extent of plaintiff's injuries, and past and future lost wages. The *Tierney* court also noted it would "consider the ratio of special damages to the overall award." *Id.*

¶ 56        Upon consideration of the aforementioned factors, we find the damages award not excessive. The jury's role was to consider witness credibility and award of damages. *Richardson*, 175 Ill. 2d at 114. The record shows plaintiff suffered permanent injuries, including a tear, to the disc in his spine. These injuries could not be repaired; only the pain could be treated. While the questionnaires completed in the fall of 2015 show minimal pain, plaintiff testified the pain increased over time. This testimony was bolstered by Dr. Gornet's testimony showing plaintiff's treatment progressed from physical therapy to cortisone shots, which were injected approximately two months after the last questionnaire was completed. Plaintiff testified his life

was affected by his injuries. Exercise was hindered, as he could no longer walk his dog and had gained 20 to 25 pounds. Plaintiff could no longer participate in certain activities with his grandchildren. Lifting was difficult. Plaintiff could not drive the two and a half hours to St. Louis without stopping twice due to the pain from sitting. Plaintiff's sleep was interrupted. Given plaintiff's life expectancy, plaintiff will endure this pain for 26 years. The jury believed plaintiff. The verdict does not shock the conscience.

¶ 57                                    III. CONCLUSION

¶ 58            We affirm the trial court's judgment.

¶ 59            Affirmed.

¶ 60            JUSTICE HARRIS, specially concurring:

¶ 61            I agree we should affirm in this case. Further, I agree with the majority's resolution of defendants' claims that the jury's failure to find plaintiff was contributorily negligent was not against the manifest weight of the evidence and its verdict was not excessive. However, I write separately to address their claim that the jury returned a "legally inconsistent verdict" when it found defendants were negligent but failed to also find plaintiff was contributorily negligent. Defendants argue that a plaintiff who successfully invokes the deliberate-encounter exception to the open and obvious doctrine *must* also be found contributorily negligent *as a matter of law*. I find their assertion is without legal support.

¶ 62            In their brief, defendants assert the following legal proposition: "The recognition of a deliberate encounter exception to a rule of no liability necessarily requires a finding of comparative fault to be consistent. When a plaintiff has safer choices available, yet, elects the more dangerous way to do his job, the plaintiff is guilty of contributory negligence as a matter of law."

- 21 -

Defendants cite to a single case, *Rhoades v. W. E. O'Neil Construction Co.*, 80 Ill. App. 3d 1117, 400 N.E.2d 1035 (1980), in support of their proposition. In *Rhoades*, the plaintiff was a foreman at a job site and was injured when he fell down a stairway. *Id.* at 1117. The testimony revealed the lighting was out in the stairway and the stairway was littered with construction debris, including planking and concrete blocks. *Id.* at 1118. Further, the evidence showed plaintiff had traversed the stairway on three prior occasions that day. *Id.* Plaintiff acknowledged he did not attempt to find a flashlight and also that there might have been another way to access the second floor. *Id.* at 1119. The trial court in *Rhoades* granted the defendant summary judgment finding the plaintiff was contributorily neglect as a matter of law. In affirming, the Third District found the "[p]laintiff was thoroughly familiar with the nature and location of the dangers he faced up on the stairway, and *** he chose to encounter those hazards while in total darkness." *Id.* at 1121.

¶ 63        While factually similar to this case, *Rhoades* was decided in 1980, 10 years before the supreme court adopted the "open and obvious" rule in *Ward v. K Mart Corp.*, 136 Ill. 2d 132, 145, 554 N.E.2d 223, 229 (1990) (recognizing that a plaintiff may be owed a duty of reasonable care despite the presence of a known or obvious risk), and almost 20 years before the supreme court's specific adoption of the deliberate encounter exception to the open and obvious doctrine in *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 390, 706 N.E.2d 441, 447 (1998). In light of the significant developments in premises liability law since *Rhoades*, I find that case to be of negligible value in evaluating defendants' suggested legal proposition. Moreover, nothing in *Ward* or *LaFever* supports defendants' argument that a plaintiff who encounters a known or obvious hazard when a safer route exists, *must* be found contributorily negligent. In *Ward*, the court stated:

          "We agree with plaintiff that the fact a person's injury resulted from his

- 22 -

encountering a known or open and obvious condition on a defendant's premises is a proper factor to be considered in assessing the person's comparative negligence. It is unquestionably relevant to *whether* the injured party was exercising a reasonable degree of care for his own safety. And in this respect a plaintiff's own fault in encountering such a condition will not necessarily bar his recovery." (Emphasis added.) *Ward*, 136 Ill. 2d at 143.

The court in *Ward* did not say that a plaintiff who has deliberately encountered a known hazard must necessarily be found to have failed to exercise reasonable care for his own safety. Instead, *whether* he was in the exercise of reasonable care for his own safety is a question for the trier of fact. Clearly, if a plaintiff is found to have exercised ordinary care for his own safety, he cannot be found guilty of contributory negligence.

¶ 64        The law simply does not support defendants' argument that a plaintiff, who has invoked the deliberate encounter exception to the open and obvious doctrine, must be found contributorily negligent as a matter of law when the evidence shows a safer path was available to him. Ultimately, the reasonableness of such a plaintiff's actions is to be judged by the trier of fact in determining whether he was in the exercise of ordinary care for his own safety. For the reasons stated by the majority, the jury's determination here that plaintiff did exercise ordinary care for his own safety was not against the manifest weight of the evidence.