NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220108-U

NO. 4-22-0108

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 26, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| KYLE PRICE, as Independent Administrator of the | ) | Appeal from the |
| Estate of Samuel Price, Deceased, | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | McLean County |
| v. | ) | No. 21L4 |
| CK BRUSH PLUMBING, LLC, | ) | |
| Defendant-Appellee. | ) | Honorable |
| | ) | Rebecca S. Foley, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The appellate court affirmed, concluding the trial court committed no error in granting defendant's motion for summary judgment based on the open and obvious doctrine. The distraction and deliberate encounter exceptions did not apply.

(2) The trial court did not abuse its discretion in denying plaintiff's motion for leave to amend.

¶ 2    Samuel Price (decedent) was experiencing a sewage problem at his home and contacted defendant CK Brush Plumbing, LLC, for assistance. In the course of its work for Price, defendant's employees dug a large hole on the property. Several months later, decedent was found lying dead at the bottom of the hole. The cause of death was identified as "cervical spinal injuries due to a fall into a sewage sump pit."

¶ 3    Plaintiff Kyle Price, as independent administrator of the estate of his late father, filed a wrongful death action against defendant, alleging decedent died after falling into a hole on

his property that defendant negligently created. The trial court granted summary judgment in defendant's favor, finding defendant owed no duty because the condition at issue was open and obvious. Plaintiff subsequently filed an emergency motion for leave to file a first amended complaint, which the court denied. Plaintiff appeals both rulings, arguing (1) the court's grant of summary judgment was improper because there are issues of material fact regarding application of the open and obvious doctrine and (2) the court abused its discretion by denying his motion for leave to amend. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        Plaintiff filed his complaint against defendant alleging that defendant was hired to perform work on decedent's property and as part of that work "created a hole on the premises, approximately seven by eight feet wide and five feet deep." Plaintiff asserted defendant "had a duty to use ordinary care for the safety" of decedent but breached its duty in several respects, including: (1) improperly operating, managing, maintaining, and controlling the property; (2) failing to provide a safe "route of access" on the property; (3) failing to warn of the dangerous condition existing on the property; (4) failing to provide adequate safeguards to prevent injury; (5) allowing the hole "to remain out of condition and in disrepair"; (6) failing "to adhere to appropriate requirements and codes"; (7) failing to ensure a safe and suitable walkway; and (8) negligently creating a dangerous condition on the property.

¶ 6        Defendant filed a motion for summary judgment, arguing the hole was an open and obvious condition of which decedent was well aware and, as a result, it owed him no duty of care. Defendant also maintained that no exception to the open and obvious doctrine applied. Plaintiff responded that both the distraction exception and deliberate encounter exception to the open and obvious doctrine were applicable. He asserted that, pursuant to those exceptions, defendant had a

duty to protect decedent against the dangerous condition it created on his property.

¶ 7        The evidence presented with the motion and response showed that decedent resided at 1806 South Morris Avenue in Bloomington, Illinois, with plaintiff, his youngest adult son. At some point in 2018, decedent began experiencing a "sewage blockage problem" on his property that resulted in sewage "backing up" into the basement of his residence. Decedent initially contacted A-1 Haney Plumbing, Inc. (A-1 Haney) about the problem, and in March and April 2018, A-1 Haney employees visited decedent's property to explore the issues. During the visits, they used both a camera and "high-pressured jetting" to investigate and unclog decedent's sewer line. Ultimately, their efforts were unsuccessful and, despite contacting both the City of Bloomington and the McLean County Health Department, A-1 Haney was unable to determine whether decedent's property was "on city sewer or on a septic system."

¶ 8        Decedent continued to experience sewer problems into early 2019 and eventually sought help from defendant. In early May, defendant's employees, Nicholas Beall and Tony Cottone, visited decedent's property and inserted a camera into his sewer line to attempt to diagnose the problem. However, at some point, the camera "got stuck," and the employees "couldn't figure out where the sewer was headed to." One week later, Beall and Paul Brush, defendant's vice president, returned to decedent's property and Brush used a mini excavator to dig a hole in the location where the camera had stopped the week before. Beall and Brush placed a "trash pump" in the hole "to get water out so that [they] could visibly see what was going on." According to Beall, they found a collapsed sewer pipe, but could not determine where decedent's sewer was going or whether it was hooked into the city sewer line.

¶ 9        Brush testified he dug the hole on decedent's property to locate a septic tank. Instead of a septic tank, there was a pipe leading to the adjacent property. Brush described the pipe

as "butt tile" that consisted of "two pieces of pipe put together with no connector." Once the pipe was uncovered, "sewage would just run out [of] the tile." Brush and Beall pumped the sewage out of the hole so they could see the pipe and then they "probed around" with a camera to look for a septic tank.

¶ 10    Plaintiff estimated that the hole was six feet deep and six feet by six feet wide. After the hole was dug, Beall put up an orange construction fence with caution tape because he felt the hole posed a potential safety hazard. The construction fencing was three and a half feet tall and placed around three sides of the hole. The fourth side of the hole was protected by a taller, existing boundary fence. Beall testified the construction fence was compliant with Occupational Safety and Health Administration (OSHA) standards. Eric Haney, the owner of A-1 Haney, who was familiar with the hole, agreed that the hole was obvious and acknowledged that the fencing around the hole was acceptable "by OSHA rules." Haney said that, in his professional experience, he had never left an open hole of that size on someone's property. He stated that, at a minimum, he would have "covered the hole with 4-by-4s, screwed plywood down to it, and put in a hatch for inspection."

¶ 11    Eric Leman, a plumbing inspector for the City of Bloomington, testified he was not aware of defendant violating any portion of the plumbing code with respect to its work on decedent's property. Leman explained that in his experience as a plumber, the use of "caution tape and then some kind of fence barrier" was used more commonly as a safety measure for an open hole than "plywood and two-by-fours."

¶ 12    The hole dug by defendant remained on decedent's property for several months. Plaintiff testified that decedent had told him defendant recommended rerouting the sewer line to the north to "hook into the city sewer" and that doing so would cost $35,000 to $40,000. But, plaintiff added, decedent did not want to reroute his line. Brush investigated both the option of

- 4 -

rerouting decedent's sewer to the city's sewer system and putting in a new septic system on decedent's property. He then gave decedent an oral estimate of $17,000 or $18,000 to reroute his sewer. Although decedent initially agreed to that plan, he later decided he wanted to see if there was an existing septic tank on his property. Brush believed any septic tank was likely on an adjacent property and advised decedent "to get permission to dig on the adjacent property or contact a lawyer and see if the City of Bloomington would help him out with pricing and getting a new sewer to his house." Brush believed defendant's employees returned to decedent's property once or twice after the hole was dug to probe and shovel various spots on the property looking to find a septic tank. He asserted decedent never asked defendant to return to his property to refill the hole, but he acknowledged that if the hole had been filled in decedent's "basement would have been backing up all the time."

¶ 13    The record contains conflicting evidence regarding whether defendant's employees left a pump in the hole on decedent's property after the hole was dug. Beall recalled that only a trash pump was used in the hole, and defendant did not typically leave a trash pump behind after leaving a work site. He maintained he removed the trash pump from the hole on decedent's property the same day the hole was dug. To his knowledge, defendant did not leave another pump in the hole, and he stated, "[T]hat's not something that we would have done." Beall acknowledged that if there was no pump in the hole, the hole would eventually fill up with sewage water.

¶ 14    Beall testified the trash pump defendant used could "occasionally clog or get backed up." He stated that "[n]ormally it would just get mud on the bottom of it, and you would just have to clean it off." He also agreed that sump pumps would not "run forever" and, [d]epending on the application," a pump would need to be maintained or cleaned.

¶ 15    Brush agreed that a sump pump needed to stay in the hole if it was not going to be

filled in. He stated defendant's employees left a trash pump in the hole after it was dug to remove sewage from the hole. However, defendant removed the pump about a week later after decedent received a violation notice from the city and because defendant "didn't have an answer from [decedent] on what he wanted to do." Brush also acknowledged that the pump would have to be monitored "on a day-to-day basis" by the landowner. He disagreed that someone would have to walk up to the construction fence by the hole to see if the pump was working. He testified as follows: "You can see if the pump was running by wherever the hose was going. If water wasn't coming outside of that hose, then you would know that the pump wasn't running."

¶ 16        Plaintiff, on the other hand, testified defendant placed and left a sump pump in the hole after it was dug. Initially, a hose attached to the pump drained sewage out to the alleyway that was next to decedent's property. Plaintiff stated decedent received a complaint from the City of Bloomington regarding where the sewage was draining. Decedent contacted defendant, who then moved the hose to a different location. It was plaintiff's understanding that the sump pump was placed in the hole to help prevent decedent's basement from flooding with human excrement. Plaintiff further testified that the sump pump placed by defendant remained in the hole until January 2020, when it "died out" or "went out." He and decedent went to Menards to purchase another sump pump, which plaintiff then installed inside the hole.

¶ 17        According to plaintiff, he and decedent checked on the sump pump daily. He stated they "just checked to make sure it was running" to prevent sewage from backing up into decedent's basement or from overflowing from the hole onto the land. Plaintiff described how he and decedent would check the pump, stating as follows: "You can just walk up to the side, you know and look at it. You could hear it running. You wouldn't even have to get close to it to see that." Plaintiff agreed that the pump had not been removed from the hole for cleaning. He stated that other than

replacing the pump in January 2020, he had never been in the hole, nor had he seen anybody else in the hole.

¶ 18        Decedent's eldest son, Cory Price, who resided in California, testified that he had visited decedent's home over Christmas 2019. He was aware decedent's property had sewage problems and during his visit he had observed the hole dug by defendant. Cory also saw decedent checking on a sump pump inside the hole "to make sure it was working." He stated decedent would "look over" and ensure water was not "over that pump." It was his understanding that decedent and plaintiff would check to make sure the pump was working every day.

¶ 19        On February 2, 2020, plaintiff found his father dead in the hole. Plaintiff testified he had no knowledge of how decedent "ended up in the hole before he died" and that he knew of no evidence that decedent had been distracted. He agreed that decedent "knew that the hole was there" from the time it was dug until the time he passed away. Decedent had told plaintiff that he was worried about the hole and did not want anyone around it. To plaintiff's knowledge, decedent had never been in the hole prior to February 2020. He even recalled decedent remarking that he "would never get close to that hole" and that he stated, " 'There's no way in hell I could get out of that.' " Decedent had been in a car accident as a young man and lost his right arm. However, plaintiff described decedent as being in "good shape" and stated decedent had no medical issues and no problems with balance or dizziness.

¶ 20        Plaintiff stated that the work defendant performed on decedent's property in May 2019 corrected decedent's sewage backup problem, and that there were no subsequent sewage backups in decedent's basement. He asserted the sump pump was still working on the day decedent died. Plaintiff further testified as follows:

"Q. And then after [decedent] was found, did you determine that there was

a problem at that point that he would have been working on?

A. No. And I don't even know what he would have been doing anyway. He never would have been working on that pump.

Q. You continued to live at the house for a few months after February 2, right?

A. Yes.

Q. And no problems with the sewage system during that time?

A. No.

Q. Do you have any idea why [decedent] was in the hole?

A. No. I have no clue, no clue at all."

¶ 21 After decedent's death, his son Cory hired A-1 Haney to fix the sewage problems on the property and fill in the hole. He paid $18,200 for the work, which entailed rerouting the sewer on decedent's property to "tie into" the City of Bloomington's sewer system through a manhole on an adjacent property.

¶ 22 At the conclusion of the January 12, 2022, hearing on defendant's motion for summary judgment, the trial court orally granted the motion for summary judgment on the basis that defendant owed no duty of care to decedent. The court found the hole on decedent's property was an open and obvious condition and neither the distraction exception nor the deliberate encounter exception to the open and obvious doctrine applied. A written order consistent with the court's oral ruling was filed the next day. On January 14, plaintiff filed an emergency motion for leave to file a first amended complaint. He sought to add a claim against defendant based on a voluntary undertaking theory of liability prior to the expiration of the statute of limitations on February 2, 2022. On January 31, 2022, the court conducted a hearing and denied plaintiff's motion

- 8 -

to amend in an order dated February 1, 2022.

¶ 23   This appeal followed.

¶ 24        II. ANALYSIS

¶ 25       A. Standard of Review

¶ 26   Under Section 2-1005 of the Illinois Code of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). Summary judgment is a drastic measure that should only be allowed when the right of the moving party is clear and free from doubt. *Suburban Real Estate Services, Inc. v. Carlson*, 2022 IL 126935, ¶ 15. However, the use of summary judgment in a proper case is to be encouraged. *Jones v. Pneumo Abex LLC*, 2019 IL 123895, ¶ 31. Appellate review of a trial court's grant of summary judgment is under the *de novo* standard. *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 17.

¶ 27   The issue presented below is one of duty. Whether a duty exists is a question of law for the court, and it may be determined on a motion for summary judgment. *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 421 (1992). "Whether a dangerous condition is open and obvious may present a question of fact," but "where no dispute exists as to the physical nature of the condition, whether the dangerous condition is open and obvious is a question of law." *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 18.

¶ 28     B. Duty—Open and Obvious Conditions

¶ 29   Both parties here begin their analysis by reference to the general rule that a possessor of land is subject to liability for physical harm caused to others as a result of a dangerous condition on the premises. *Genaust v. Illinois Power Co.*, 62 Ill. 2d 456, 468 (1976); see also

- 9 -

Restatement (Second) of Torts § 343. The open and obvious rule can apply even where the defendant is neither an owner nor possessor of the land. It is "firmly established in Illinois that a party that creates a dangerous condition will not be relieved of liability because that party does not own or possess the premises upon which the dangerous condition exists." *Corcoran v. Village of Libertyville*, 73 Ill. 2d 316, 324 (1978); see also *Hutson v. Pate*, 2022 IL App (4th) 210696, ¶¶ 53-60. The party creating the dangerous condition is liable "to the same extent as would be the owner or possessor." *Corcoran*, 73 Ill. 2d at 324. The evidence here is that defendant created the hole plaintiff contends was dangerous.

¶ 30        As the general rule applies here, so too does the "open and obvious" exception to that rule: a defendant is "not ordinarily required to foresee and protect against injuries from potentially dangerous conditions that are open and obvious." *Bucheleres v. Chicago Park District,* 171 Ill. 2d 435, 447-48 (1996). "Reasonable care on the part of the possessor therefore does not ordinarily require precautions, or even warning, against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them." Restatement (Second) of Torts § 343A cmt. e (1965).

¶ 31        Whether the excavated ground here is considered a "hole" (see *Peters v. R. Carlson & Sons, Inc.*, 2016 IL App (1st) 153539, ¶¶ 2, 19), or whether its depth is the functional equivalent of a "height" (see *Bruns*, 2014 IL 116998, ¶ 17), both the condition and the danger presented by it meet every definition of open and obvious. The condition was created as a result of work that decedent requested; once completed, it was a conspicuous feature on his property; it was well known to decedent; and he encountered it daily for a period of months. Plaintiff conceded at oral argument that the hole constituted an open and obvious condition; in other words, a defendant could normally expect a person lawfully on the premises to guard against the danger presented and

owes no duty.

¶ 32    The real issue here is whether either the "distraction" or "deliberate encounter" exception to the rule of non-liability for open and obvious conditions apply here. If either exception applies, then defendant owed a duty to protect decedent against the danger posed by the excavated hole.

¶ 33                         C. The Distraction Exception

¶ 34    An exception to the general rule of non-liability for open and obvious conditions is what has come to be known as the "distraction exception." Although a condition may be open and obvious, the owner or possessor may still owe a duty where there is "reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it." *Ward v. K Mart Corp.*, 136 Ill. 2d 132, 149-50 (1990) (quoting Restatement (Second) of Torts § 343A cmt. f (1965)).

¶ 35    The distraction exception will apply only "where evidence exists from which a court can infer that plaintiff was actually distracted." *Bruns*, 2014 IL 116998, ¶ 22; *Sollami v. Eaton*, 201 Ill. 2d 1, 16-17 (2002). Plaintiff here argues that the evidence of distraction is that decedent was required to check on the pump daily to ensure that it was working; thus, plaintiff argues, it is reasonable to anticipate that decedent "would momentarily fail to avoid the risk of the hole" as he checked on the operation of the pump. This argument is entirely a matter of speculation, as there is no evidence in the record to suggest that decedent was distracted or that distraction is why he fell into the hole. In addition, plaintiff is construing the hole and the pump as though they were separate and unrelated, essentially suggesting that decedent's attention could be diverted from the hole because he was distracted by the pump *in the hole*. This is an insufficient basis to find, as required, that decedent was "actually distracted."

¶ 36 Plaintiff argues that the fact that decedent was missing one arm due to a prior amputation brings this case within the holding in *Erne v. Peace*, 164 Ill. App. 3d 420, 421-22 (1987). However, the physical limitation at issue in *Erne* was a visual impairment that affected the plaintiff's ability to perceive the dangerous condition at issue. Plaintiff fails to articulate any nexus between decedent's missing arm and his ability to appreciate the danger presented by the excavated hole.

¶ 37                                    D. The Deliberate Encounter Exception

¶ 38 Another exception to the general rule of non-liability for open and obvious conditions is the "deliberate encounter" exception. Even where a dangerous condition is open and obvious, "harm may be reasonably anticipated when the possessor 'has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.' " *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 391 (1998) (quoting Restatement (Second) of Torts § 343A cmt. f (1965)). In examining the deliberate encounter exception, the focus is on what the defendant anticipates, or should anticipate, the entrant on the land will do. *Lucasey v. Plattner*, 2015 IL App (4th) 140512, ¶ 41. It has been said that the deliberate encounter exception requires that "the injured party's only 'real' solution" is to choose to encounter the dangerous condition. *Hastings v. Exline*, 326 Ill. App. 3d 172, 176 (2001).

¶ 39 The obvious issue with invocation of the deliberate encounter exception here is that there is no evidence to show that decedent deliberately encountered the hole. We lack any information about how or why he encountered the hole on the fateful day, and it would be complete speculation to suggest that he ended up in the hole as a result of a deliberate decision. At best, the evidence would support the inference that decedent routinely approached the hole to listen for the

operation of the pump. There is no evidence that he deliberately encountered the hole itself.

¶ 40 Even if decedent had deliberately encountered the hole, the exception bearing that name would be inapplicable here. There is no reason for defendant to have anticipated that someone in decedent's position would have chosen to deliberately encounter the hole when there were other avenues available to him to satisfy his foreseeable objective of checking to see if the pump was still working.

¶ 41 Although the supreme court has more often applied the deliberate encounter exception in the context of economic compulsion, such as when employees are compelled to encounter dangerous conditions as part of their job, it has cautioned that the exception is not limited to such situations. *Sollami*, 201 Ill. 2d at 17; *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 725-26 (2010). Even so, there must nonetheless be some sort of driving force that will cause a person to encounter the obvious danger in pursuit of an advantage. *Frieden v. Bott*, 2020 IL App (4th) 190232, ¶ 53; see also *Smith v. Purple Frog, Inc.*, 2019 IL App (3d) 180132, ¶ 17.

¶ 42 We reject plaintiff's assertion that decedent was somehow compelled to encounter the hole to avoid his home filling with sewage. There is no evidence that decedent's home was threatened by sewage on February 2. Similarly, Beall's testimony that the pump might need maintenance or cleaning at some point in the future is irrelevant when, as plaintiff concedes, the pump was operational on the day in question. Simply put, there is no evidence decedent made, or was required to make, a deliberate choice to proceed in the face of a danger presented by the hole. Thus, the requisite driving force as required by *Frieden* is missing.

¶ 43 We further recognize that, in cases which do not involve an employment-based economic compulsion, the availability of reasonable alternatives may render the deliberate

encounter exception inapplicable. In *Hastings*, 326 Ill. App. 3d at 173, and *Winters v. MIMG LII Arbors at Eastland, LLC*, 2018 IL App (4th) 170669, ¶¶ 74-76, we found that the deliberate encounter exception did not apply where the plaintiff chose to traverse the dangerous condition when alternative routes were available. More recently in *Frieden*, 2020 IL App (4th) 190232, ¶ 6, we rejected application of the deliberate encounter exception where the plaintiff was injured while helping his brother-in-law work on the roof of his house. The plaintiff in *Frieden* was under no compulsion, economic or otherwise, to encounter the obvious danger of being on a roof with no safety equipment. *Id.* ¶ 52.

¶ 44        This case is like *Hastings*, *Winters*, and *Frieden*, each of which involved a person who was not facing any compulsion but who may have chosen a less safe path despite reasonable alternatives. Even if decedent had good reason to check on the operation of the pump, he could have done so by listening at a safe distance or by checking the discharge end of the hose running from the hole. Plaintiff made it clear that "you can just walk up to the side, you know, and look at it. You could hear it running. You wouldn't even have to get close to it to see that." Thus, as in *Hastings*, it cannot be said that decedent's "only 'real' solution" was to choose to encounter the dangerous condition. There was no reason for defendant to anticipate that decedent would "encounter" the hole itself.

¶ 45        E. Traditional Tort Analysis

¶ 46        The supreme court has cautioned that the "existence of an open and obvious danger is not an automatic or *per se* bar to the finding of a legal duty," and the court must still apply traditional duty analysis to the facts of the case. *Bruns*, 2014 IL 116998, ¶ 19. In determining whether a duty exists, a court should consider (1) the reasonable foreseeability of injury, (2) the reasonable likelihood of injury, (3) the magnitude of the burden that guarding against injury places

on the defendant, and (4) the consequences of placing that burden on the defendant. *LaFever*, 185 Ill. 2d at 389; *Bucheleres*, 171 Ill. 2d at 456.

¶ 47 Where the danger is open and obvious, the first two factors of the duty analysis—the foreseeability and likelihood of injury—weigh against the imposition of a duty. *Bruns*, 2014 IL 116998, ¶ 19. We must still consider the third and fourth factors: the magnitude of guarding against the injury and the consequences of placing that burden on defendant. *Id.* ¶ 14.

¶ 48 Assessing the magnitude of the burden of the duty on defendant requires some understanding of what meeting that duty might entail. Plaintiff's complaint and his brief suggest that that either the hole should have been "repaired," *i.e.*, filled in, or defendant should have installed a more robust seal around or over it. The magnitude of guarding against the injury is not great, as the steps suggested by plaintiff are not dramatic or complicated.

¶ 49 The consequence of putting the burden on defendant in this highly unique circumstance, however, is fraught with complexity. Should defendant have filled the hole—the hole that plaintiff says was temporarily solving the sewage backup problem, and which needed to be continually drained to be effective—before decedent settled on an alternate way to prevent the sewage from backing up? Should defendant have made the hole more inaccessible, when plaintiff himself testified he needed access to the hole to replace a pump that had stopped working? The point is simply that these two parties were not strangers to the creation of the hole; they were, in a sense, collaborators in its creation. Imposing a duty on one of them does not fit neatly within the normal parameters of tort duties, and for this reason it is difficult to say that the fourth factor—the consequences of placing a duty on defendant—weighs in favor of imposing a duty.

¶ 50 Considering all four factors, the first two weigh against imposition of a duty; the third weighs in favor of imposition of a duty; and the fourth is neutral at best. Considering all four

factors together, we find that, on balance, they do not favor the imposition of a duty under these circumstances.

¶ 51                    F. Motion for Leave to Amend—Voluntary Undertaking

¶ 52        Plaintiff sought leave to amend to state a claim against defendant for a voluntary undertaking. In ruling on the motion, the trial court properly considered the factors specified in *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992): (1) whether the proposed amendment would cure the defective pleading, (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment, (3) whether the proposed amendment is timely, and (4) whether previous opportunities to amend the pleading could be identified. A trial court has broad discretion when ruling on a motion for leave to amend pleadings, and its denial of a motion to amend will not be reversed absent a manifest abuse of that discretion. *Loyola Academy*, 146 Ill. 2d at 273-74.

¶ 53        The trial court disagreed with plaintiff's characterization of the proposed amendment as a "clarification" of his pleadings, and instead viewed it as the addition of a "new theory." Consequently, in assessing whether the proposed amendment would "cure" plaintiff's pleadings, the court essentially examined whether the new theory—that of a voluntary undertaking—might survive when plaintiff's negligence theories had not. The trial court felt *Buerkett v. Illinois Power Co.*, 384 Ill. App. 3d 418 (2008), demonstrated that a voluntary undertaking theory would not be applicable to a case such as this one. *Buerkett* states that a voluntary undertaking may be found where a party who undertakes to render services to another, gratuitously or for consideration, and fails to exercise reasonable care if either (1) such failure increased the risk of harm or (2) the injured party relied on the undertaking. *Buerkett*, 384 Ill. App. 3d at 427.

¶ 54        The trial court's view of the viability of a voluntary undertaking theory here is correct. Any duty imposed by virtue of a voluntary undertaking is construed narrowly, and it is limited to the extent of the undertaking. *Bell v. Hutsell*, 2011 IL 110724, ¶ 12. The undertaking here cannot be the creation of the hole; there is nothing about the hole's creation alleged to have been negligently undertaken. The erection of a fence around the hole could constitute the undertaking, but one cannot plausibly argue that the erection of a fence made the hole *more* dangerous, *i.e.*, that it increased the risk of harm. What plaintiff appears to focus on are actions which defendant did not undertake but which plaintiff feels it should have, such as filling or covering the hole. Such an approach is contrary to the required narrow construction of a voluntary undertaking, which is limited to the extent of the undertaking. We agree with the trial court that the proposed amendment would not cure a defect in the pleadings, and therefore this factor does not weigh in favor of amendment.

¶ 55        The trial court also considered the other three factors specified in *Loyola Academy*, noting with respect to several of them that discovery was essentially complete, and the case appeared to be ready for trial. It was clear, however, that the trial court was most concerned with allowing an amendment on a voluntary undertaking theory which appeared to lack viability in this case. Given the significant discretion vested in the trial court on decisions pertaining to amendment of pleadings, we cannot find that the trial court abused its discretion in denying leave to amend.

¶ 56                              III. CONCLUSION

¶ 57        For the reasons stated, we affirm the trial court's judgment.

¶ 58        Affirmed.